**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Deborah J. Piazza, as Chapter 7 Trustee of the Orly Genger Estate, Orly Genger, Arie Genger, David Broser, and ADBG LLC, | **Chapter 7** |
| | **Main Case No. 19-13895 (JLG)** |
| Plaintiffs, | **Adv. Proc. 22-** |
| v. | **COMPLAINT** |
| Dalia Genger, Sagi Genger, Michael Oldner, Elana Genger, Manhattan Safety Maine, Inc., Recovery Effort, Inc., Robin Rodriguez, D&K GP LLC, TPR Investment Associates, Inc., The Orly Genger 1993 Trust, Created by Trust Agreement Dated December 13, 1993 between Arie Genger, as Grantor, and Lawrence M. Small and Sash A. Spencer, as Trustees, John Dellaportas, David Parnes, and John and Jane Does 1 through 10, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Deborah J. Piazza, as Chapter 7 trustee of the Orly Genger estate (the "<u>Trustee</u>"), Orly Genger, Arie Genger, David Broser, and ADBG LLC (collectively, "<u>Plaintiffs</u>"), by their undersigned attorneys, allege, as applicable to each of their respective claims, against Defendants as follows:

## I.   <u>INTRODUCTION</u>[1]

1.      This is an action to equitably subordinate the claims of all Defendants who filed claims in this Chapter 7 case, and to hold the Defendants, as applicable, accountable for their willful, malicious and tortious conduct, including their breaches of fiduciary duty.

---

[1] Capitalized terms not defined in Introduction have the meanings ascribed to such terms where otherwise defined in the Complaint.

2.      The Defendants' wrongful actions have caused severe financial and mental

distress and other damages to the debtor, Orly Genger, over many years and ultimately caused

her bankruptcy filing.  They have also wrongfully deprived Plaintiffs Arie Genger, David Broser

and ADBG LLC of $15 million in proceeds from a 2013 settlement described further below.

3.      The Defendants' actions all fundamentally relate to Arie Genger's 2004 divorce

from his wife, Dalia Genger, and to a 2013 settlement that certain of the Plaintiffs entered into to

settle claims related to shares in a company called Trans-Resources, Inc. ("TRI"), which Arie

had founded, and the control and value of which Arie and Dalia negotiated as part of their

divorce.  The settlement proceeds totaled approximately $50 million.  Ever since the settlement,

various Defendants, largely at Defendant Sagi Genger's behest and direction, have tried to usurp

the settlement funds for themselves.  Indeed, Sagi has succeeded in usurping more than $17

million already (in addition to another $27 million that Sagi realized in selling the Sagi Trust's

TRI shares to the Trump Group).  Sagi accomplished this through a series of self-dealing

transactions involving entities called TPR and D&K, and a certain D&K Note.

4.      Not content with that windfall, Sagi and the other Defendants also sought the rest

of the settlement proceeds—$32.3 million (the "Disputed Settlement Proceeds") that was

supposed to be paid to Arie and ADBG, and have intentionally interfered with ADBG's rights

and the maturity of certain related notes.[2]  Among other actions, the Defendants employed a

multitude of legal maneuvers seeking the same funds, but on different, competing, and

contradictory grounds.  For example, Sagi filed a "turnover" motion in a case pending before the

---

[2] To the extent the Trustee's Settlement Motion is not approved by the Court, the Trustee reserves the right to pursue
certain transferees of the Disputed Settlement Proceeds and any allegations set forth herein as to how the Disputed
Settlement Proceeds were to be distributed shall not be used against the Trustee in any future litigation, to the
extent necessary.

United States District Court for the Southern District of New York contending that the funds belong to Orly,[3] and filed a motion to dismiss in this case asserting the same.[4]  Meanwhile, the Orly Trust argued to the New York State Surrogate's Court, in actions now removed to this Court, that the funds belong to the Orly Trust.[5]  And Dalia commenced a "constructive trust" adversary proceeding in this Court, which has since been dismissed, arguing that the funds belong to her.  Notably, the Orly Trust, who has asserted that the funds belonged to the Orly Trust, did not intervene or otherwise object or protest Dalia's assertion of a constructive trust.[6]

5.    Defendants' conduct drove Orly into bankruptcy.  Defendants' conduct also caused the breach of a Credit Agreement and delayed the maturity of two $7.5 million notes. But for the Defendants' tortious activities, the amounts due under the Credit Agreement would have been timely repaid, and the notes would have been fully paid to Arie and/or his creditors. Plaintiffs also conspired to cause the breach of the Credit Agreement, to prevent payment of the notes, and to manufacture jurisdiction in related proceedings to draw out litigation involving the Plaintiffs.

6.    Certain Defendants also violated the automatic stay by taking actions to obtain and/or exercise control over estate property, primarily by purporting to release claims belonging to Orly, the debtor.  These violations of the automatic stay are addressed in the complaint filed by the Trustee against certain Defendants styled as *Piazza v. Oldner, et al.*, Adv. Pro. No. 21-01880, which remains pending before the Court.

---

3.  *Genger v. Genger*, Case No. 17-cv-8181 (S.D.N.Y. June 11, 2019), ECF No. 214.

4.  *In re Orly Genger*, Case No. 19-13895-jlg (Bankr. SD.N.Y. Apr. 24, 2020), ECF No. 239.

5.  Case Nos. 20-01187-jlg and 20-01188-jlg.

6.  *Dalia Genger v. Orly Genger*, Case No. 20-01010-jlg (Bankr. S.D.N.Y.).

7.    Defendants' tortious actions and bogus claims continue a pattern of conduct that began more than fifteen years ago and has involved numerous actions in various courts in multiple states.  Plaintiffs detail that pattern here to provide the necessary context for Plaintiffs' claims.

8.    In addition, certain Defendants filed claims against the estate.  Those Defendants, however, engaged in intentional conduct that smacks of bad faith beyond any bounds of decency.  Their conduct harmed Orly and other creditors and gave the Defendants an unfair advantage in Orly's Chapter 7 case.  The Court should therefore equitably subordinate those Defendants' claims.

## II.    STAY PENDING DISPOSITION OF PENDING MOTIONS

9.    The Plaintiffs filed this Complaint in advance of the potential expiration of the limitations periods for certain of Plaintiffs' causes of action in order to preserve Plaintiffs' claims based on actions, detailed below, that certain Defendants took in June 2019.  As stated in the Trustee's pending Motion For Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement and Granting Related Relief  (the "Trustee's Settlement Motion") [Dkt. No. 421], the Trustee intends to assign to Claims Pursuit Inc. whatever rights the estate may have against, among others, Oldner and Dalia, referred to as the "unasserted claims") as more fully set forth in the Trustee's Settlement Motion.  The Trustee's Settlement Motion, along with Sagi's motion to dismiss this Chapter 7 Case remain pending and are *sub judice* before this Court.  The Court's decisions in connection with such motions will impact who the plaintiff will be on the claims asserted by the Trustee herein.  Accordingly, the Plaintiffs are prepared to voluntarily stay this action pending disposition of those motions, at which point it will become clear which Plaintiffs will remain as it relates to the various counts reflected herein.

### III. <u>JURISDICTION & VENUE</u>

10.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 1334 and 157(a) and the United States District Court for the Southern District of New York's

Amended Standing Order of Reference, M-431 dated January 31, 2012, which refers such

proceedings to this Court.

11.     This action is a core proceeding pursuant to 28 U.S.C. § 157(b).

12.     Plaintiffs consent to entry of a final order or judgment in this action by this Court.

13.     Plaintiffs demand a jury trial and consent to such trial being conducted by this

Court.

14.     Venue is proper pursuant to 28 U.S.C. § 1409.

### IV. <u>PARTIES</u>

15.     Plaintiff Deborah Piazza is the Chapter 7 trustee and legal representative of Orly

Genger's bankruptcy estate.  The Trustee is a resident of the State of New York and is a licensed

attorney maintaining an office at c/o Tarter Krinsky & Drogin LLP, 1350 Broadway, 11th Floor,

New York, New York 100018.

16.     Plaintiff Orly Genger ("<u>Orly</u>") is the debtor in this Chapter 7 case, and resides in

Austin, Texas.  Orly is the adult daughter of Plaintiff Arie Genger and Defendant Dalia Genger.

Orly is the primary beneficiary of the Orly Trust (defined below).  Orly is a plaintiff in this

action to the extent that she has any direct rights of recovery.

17.     Plaintiff David Broser is an individual who resides in the State of New York.

18.     Plaintiff ADBG LLC ("<u>ADBG</u>") is a limited liability company organized under

the laws of the State of New York.

19.     Plaintiff Arie Genger ("<u>Arie</u>") is an individual who resides in the State of Florida,

and is the father of Orly and Defendant Sagi Genger ("<u>Sagi</u>").

20.    Defendant D&K GP LLC is a limited liability company organized under the laws of Delaware and having its principal place of business in New York, New York.

21.    Defendant Sagi Genger is the adult son of Arie and Defendant Dalia Genger, and is an individual who resides in mansions located in New York City and Connecticut, having recently sold a third mansion in Florida for approximately $6.5 million.  Upon information and belief, Sagi is the president and CEO of Defendant TPR and a controlling member of TPR's Board of Directors.  Sagi is a defendant both in his individual capacity and in his capacity as the president and CEO of TPR, in addition to any other fiduciary role he serves with respect to any other Defendant.

22.    Defendant Dalia Genger ("Dalia") is the mother of Sagi and Orly and the former wife of Arie.  She is an individual who resides in the City, County and State of New York.  Dalia was the trustee of the Orly Trust (defined below) from 2008 to June 2019, when, with Sagi's assistance, she purported to resign from that position and appoint Defendant Michael Oldner to replace her as trustee, despite not knowing, speaking with or meeting Oldner.  Dalia is a defendant both in her individual capacity and in her capacity as the former trustee of the Orly Trust, in addition to any other fiduciary role she serves with respect to any other Defendant.

23.    Defendant the Orly Genger 1993 Trust (the "Orly Trust") is a New York trust created by a trust agreement dated December 13, 1993 between Arie Genger, as Grantor, and Lawrence M. Small and Sash A. Spencer, as Trustees.  Arie created the Orly Trust for the benefit of Orly and her heirs, which now include her young daughter.  Defendant Michael Oldner purports to be the present trustee of the Orly Trust.

24.    Defendant Elana Genger is the wife of Defendant Sagi Genger, and is an individual who resides in mansions located in New York City and Connecticut, having recently

sold a third mansion in Florida for approximately $6.5 million.  She is a necessary party defendant to this action because one of the releases that Plaintiffs seeks to annul identifies her and her affiliates as releasees.

25.    Defendant TPR Investment Associates, Inc. ("TPR") is a corporation organized under the laws of Delaware and having its principal place of business in New York, New York.

26.    Defendant Manhattan Safety Maine, Inc. ("Manhattan Safety") is a corporation organized under the laws of the State of Maine and having its principal place of business in Maine.  Defendant TPR purportedly assigned to Manhattan Safety all right, title, and interest in any funds owed by the Orly Trust to TPR as a result of the D&K Note, described below, and the debt evidenced thereby.

27.    Defendant Robin Rodriguez ("Rodriguez") is an individual who resides in the State of Maine.  Defendant Rodriguez purports to be Manhattan Safety's president.  Defendant Rodriguez is Sagi's longtime business partner and pays Sagi $600,000 per year.  Rodriguez is a defendant both in his individual capacity and in his capacity as president of Manhattan Safety, in addition to any other fiduciary role he serves with respect to any other Defendant.

28.    Defendant Michael Oldner ("Oldner") is an individual who resides in the State of Arkansas.  Defendant Oldner purports to be the current trustee of the Orly Trust and the current president of Recovery Effort.  Oldner is a defendant both in his individual capacity and in his capacity as the trustee of the Orly Trust and president of Recovery Effort, in addition to any other fiduciary role he serves with respect to any other Defendant.

29.    Defendant Recovery Effort Inc. ("Recovery Effort") is a corporation organized under the laws of Arkansas and allegedly having its principal place of business in Arkansas.  The

Orly Trust wholly owns Recovery Effort, and Defendant Oldner, the purported current trustee of the Orly Trust, also purportedly serves as Recovery Effort's president.

30.    Defendant John Dellaportas ("Dellaportas") is a partner of the law firm Emmet, Marvin & Martin, LLP, working in their New York City office.  He is an individual who resides in the State, City and County of New York.  Dellaportas is Sagi's and TPR's longstanding attorney in litigation relating to the Genger family, and is Sagi's and TPR's counsel of record in Orly's Chapter 7 case.  As set forth more fully below, Dellaportas is a defendant herein on Counts IX through XIV as an individual that caused harm to Plaintiff Orly Genger after the commencement of the bankruptcy case.

31.    Defendant David Parnes ("Parnes") is an individual who resides in Israel and is a close friend of, and longstanding attorney for, Sagi. As set forth more fully below, Parnes is a defendant herein on Counts IX through XIV as an individual that caused harm to Plaintiff Orly Genger after the commencement of the bankruptcy case.

32.    Upon information and belief, John and Jane Does 1 through 10, are individuals whose true names are unknown to Plaintiffs, and who conspired with, aided and abetted, and/or otherwise participated in the other Defendants' wrongful conduct described herein.

## V.    FACTUAL ALLEGATIONS

### A.    TPR Investment Associates, Trans-Resources, Inc., and the March 30, 2001 Stockholder Agreement

33.    In 1985, Arie Genger founded Trans-Resources, Inc. ("TRI"), a corporation organized under the laws of Delaware that, through its subsidiaries, manufactured and distributed fertilizer and industrial chemicals.  TRI was itself a wholly-owned subsidiary of Defendant TPR Investment Associates, Inc., which was a holding company.  Until 2003, Arie was TPR's sole shareholder.

34.     In 1993, Arie arranged a series of transactions meant to provide for the future welfare of his wife and children.

35.     In connection therewith, Arie created a trust for each of his children: the Orly Genger 1993 Trust for his daughter Orly and the Sagi Genger 1993 Trust for his son Sagi.  Arie funded each trust with a $600,000 gift.

36.     Arie also created D&K, Ltd. Partnership ("D&K," which stood for "Dalia and kids").  Dalia was named the general partner and had a 4% interest in D&K.  Each of the Trusts were limited partners and had 48% interests in D&K.  Solely for estate planning purposes, Arie then agreed to have D&K purchase 49% of TPR's stock for $10.2 million.  The purchase was funded by (1) $600,000 from each of the Trusts, (2) $50,000 from Dalia, and (3) a promissory note in the amount of $8.95 million that used the TPR shares as collateral, executed by Dalia as the general partner of D&K (the "D&K Note").

37.     The D&K Note nominally provided that D&K was to repay the principal and interest in annual installments over 10 years.  The Trusts and Dalia nominally assumed liability for repayment of the D&K Note in proportion to their respective ownership interests in D&K.  However, as confirmed during Sagi's September 6, 2007 sworn testimony, the purpose of the D&K Note was "[e]ssentially an estate planning tool, to transfer wealth," while minimizing taxes owed by the family members.  When the D&K Note was issued, none of the parties intended that it would be enforced.  In fact, all of the family members, including Sagi, acknowledged that collecting on the D&K Note would defeat the estate planning purpose by transferring wealth back to Arie and Dalia via TPR.

38.     As a result of the foregoing transactions, as of 1993, Arie directly owned 51% of TPR's shares and D&K owned 49%.  By virtue of their interests in D&K, each Trust had an indirect 23.52% interest in TPR, and Dalia had an indirect 1.96% interest in TPR.

39.     By 2001, however, TPR's wholly-owned subsidiary, TRI, was facing insolvency. Arie therefore approached a business associate, Jules Trump, and asked Trump to arrange a capital investment in TRI.  Jules Trump and his brother, Eddie Trump, organized a group of investors (the "Trump Group").[7]  On or about March 30, 2001, two Trump Group-related entities entered into a Stockholders Agreement pursuant to which they purchased most of TRI's debt obligations and received 47.15% of TRI's stock from TPR (the "2001 Stockholders Agreement").  Arie remained TPR's majority shareholder, and TPR still held 52.85% of TRI's stock.  Accordingly, Arie continued to control TRI.

40.     The 2001 Stockholders Agreement included a restriction on the parties' further transfer of TRI stock without the transferor first giving written notice and a right of first refusal to the other TRI shareholders.  The 2001 Stockholders Agreement provided that any share transfer that violated this condition would be void and that the transferred shares would revert to the transferor.

41.     In or about November 2002, TPR sent a letter to D&K seeking payment of the past due principal and interest on the D&K Note.  Sagi, as TPR's CEO, later testified under oath that this letter was merely "pro forma," and that neither he nor TPR actually intended to collect on the note.

---

7.  The Trump Group entities were TR Investors, LLC and Glencova Investment Co.

**B.    The 2004 Divorce Settlement, TPR and TRI Transfers, and Sagi's Self-Dealing**

42.    In 2004, Dalia and Arie divorced.  On October 26, 2004, Dalia and Arie entered into a Stipulation of Settlement to equitably distribute their marital property (the "Divorce Settlement").

43.    Also on October 26, 2004, TPR, Arie, and Dalia signed an Assumption Agreement, which acknowledged the D&K Note's existence and noted that, at that juncture, D&K nominally owed approximately $9.9 million, inclusive of interest, to TPR.

44.    The Divorce Settlement required that the trustees of the Orly and Sagi Trusts grant Arie irrevocable lifetime proxies to vote their TRI shares.  The parties intended that, through the proxies, Arie would retain control of TRI.

45.    In the Divorce Settlement, Dalia also acknowledged that, following execution of a Stock Purchase Agreement, she would have no ownership interest in TRI.

46.    In connection with the Divorce Settlement, on October 29, 2004, the Gengers entered into a Stock Purchase Agreement.  The Stock Purchase Agreement was the brainchild of Sagi and was instrumental in breaking a deadlock in the divorce negotiations.

47.    Pursuant to the Stock Purchase Agreement, TPR transferred its 52.85% stake in TRI as follows: 794.4 shares (13.85%) to Arie, 1,102.8 shares (19.5%) to the Orly Trust, and 1,102.8 shares (19.5%) to the Sagi Trust (the "Arie TRI Shares," "Orly Trust TRI Shares," and "Sagi Trust TRI Shares," respectively).  As a result, TPR was not supposed to have any TRI shares.

48.    Also pursuant to the Stock Purchase Agreement, Dalia received Arie's interest in TPR and became TPR's controlling shareholder, and Sagi became TPR's CEO.

11

49.    Thus, through this series of transactions, D&K and Dalia together owned 100% of TPR.

50.    At around the same time in 2004, Sagi and Dalia formed D&K GP and had it serve as D&K's general partner.  Dalia had a 99% interest and Sagi had a 1% interest in D&K GP.

51.    Also around the same time in 2004, Dalia required that the trustees of the Orly and Sagi Trusts resign and be replaced by associates of Sagi, including, at different points in time, Parnes, Leah Fang (Sagi's sister-in-law), and Rochelle Fang (Sagi's mother-in-law).

52.    In August 2006, Sagi assigned the D&K Note to his close friend and counsel Parnes.  In doing so, Sagi wrote in an August 2, 2006 memorandum to Parnes that "D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note."

53.    In 2007, Sagi stripped Dalia of her majority interest in TPR by selling a 2% interest in TPR to his mother-in-law, Rochelle Fang.  Sagi accomplished this through a January 18, 2007 Stock Purchase Agreement between TPR and Fang.

54.    Also in 2007, the D&K agreement was changed to give Sagi total power and to add the TRI shares owned by the two trusts as additional collateral for the D&K Note.

## C.    The Divorce Arbitration

55.    On May 31, 2007, Dalia commenced an arbitration against Arie concerning the Divorce Settlement.[8]  Relying on an inadvertently misstated valuation of certain litigation risk, the arbitrator awarded Dalia an additional $3.85 million, representing 50% of the value of Arie's interest in TRI.

---

8.  *Dalia Genger v. Arie Genger*, Case No. 13 170 Y 00996 07 (AAA).

56.    In a February 17, 2007 affidavit, Dalia affirmed that the Genger family had agreed that she would "not be in a position to foreclose on the [] Note, [or] to take for [herself] an interest that [she and] Arie … intended for [their] children."  Dalia further affirmed that Sagi assigned the note to Parnes as part of an effort to implement the understanding and agreement among the members of the Genger family that the Note was never to be enforced.

57.    In September 2007, Parnes and Sagi both testified in connection with the divorce arbitration that the D&K Note was worthless.  For example, Parnes testified that "the note was … basically was uncollectable" and "had no value."  Sagi testified regarding a series of 2004 emails wherein he discussed the D&K Note, noting that he "adjust[ed] downwards the value of the personal assets to reflect the worthless[ness] of the D&K note" including revising a schedule to show "a zero valuation for the D&K note."

### D.    Sagi's TPR Takeover and Sale of TRI Shares to the Trump Group

58.    In November 2007, Sagi and Leah Fang executed an "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," which permitted D&K GP to encumber D&K's TRI interests for the benefit of D&K.  Sagi signed the document as managing member of D&K GP, D&K's general partner, and Leah Fang signed as the trustee of both the Sagi Trust and the Orly Trust, D&K's limited partners.  Arie and Orly did not learn of the existence of this document for nearly two years.

59.    In January 2008, Dalia divested herself of the balance of her TPR shares by selling them to Sagi, and Sagi became TPR's president.

60.    As a result, Sagi simultaneously wore two hats, CEO of TPR, the creditor of the D&K Note, and manager of D&K, the debtor on the D&K Note.

61.    At around the same time, Sagi also caused Dalia to become the trustee of the Orly

Trust, against the wishes of Orly, who was then the sole beneficiary of the Trust.

62.    In mid-2008, Sagi and Dalia and Rochelle Fang, both on behalf of the Sagi Trust,

negotiated a series of transactions with the Trump Group.

63.    One agreement was a Stock Purchase Agreement pursuant to which the Sagi Trust

(with Fang acting as trustee) was to sell to certain Trump Group entities a total of 1,102.8 TRI

shares for approximately $27 million (the "2008 Stock Purchase Agreement").

64.    In the course of negotiating the 2008 Stock Purchase Agreement, the Trump

Group learned of the 2004 transfer of TPR's TRI shares to Arie and the Orly and Sagi Trusts.

65.    On August 11, 2008, one of the Trump Group entities initiated an action in the

District Court for the Southern District of New York (the "New York Transfer Restriction

Action") contending that the 2004 Stock Purchase Agreement violated the transfer restriction in

the 2001 Stockholders Agreement, that the 2004 Stock Purchase Agreement was therefore void,

and that the Trump Group's option rights under the 2001 Stockholders Agreement had been

activated.[9]  At around the same time, a Trump Group entity brought a similar action in the

Delaware Chancery Court.[10]

66.    On August 22, 2008, the Sagi Trust and Trump Group entities entered into the

2008 Stock Purchase Agreement.

67.    On the same date, pursuant to a side letter agreement (the "2008 Side Letter"),

Sagi sold certain Trump Group entities an option to buy both the Orly Trust's TRI Shares (for

---

9.  *Glenclova Investment Co. v. Trans-Resources, Inc., et al.*, Case No. 08 Civ. 7140 (JFK) (S.D.N.Y.).

10. *TR Investors, LLC, et al., v. Arie Genger,* C.A. No. 3994-CS (Del. Ch.).

$10.3 million) and Arie's TRI Shares (for $7.4 million) from TPR if a court voided the 2004

Stock Purchase Agreement and those TRI shares reverted to TPR.

68.    Also in 2008, Sagi, as CEO of TPR, reclaimed the D&K Note from Parnes.

69.    On August 31, 2008, Sagi, again acting as CEO of TPR, purported to send a

notice to himself (as the general manager of D&K) declaring a default under the D&K Note, and

notifying D&K that, if it failed to satisfy the full terms of the D&K Note, its shares would be

sold at public auction.  D&K did not make any payment.  TPR then notified D&K that TPR

would sell D&K's 240 shares of TPR common stock at a February 27, 2009 "auction."  TPR did

not provide notice of the "auction" to Arie, Orly, or the Orly or Sagi Trusts.

70.    Thereafter, in separate litigation also brought in the Southern District of New

York, Sagi captured for himself the $10.3 million in funds attributable to the Orly Trust TRI

Shares and the $7.4 million attributable to the Arie TRI Shares, by arguing that the TRI shares

belonged to TPR, not to Arie, Orly, or the Orly Trust.[11]

71.    Consequently, Sagi and TPR received more than $44 million from the Trump

Group for what the New York Supreme Court later described as "all of the Genger family's TRI

shares."

72.    Dalia, as trustee of the Orly Trust, did not oppose Sagi's and TPR's attempts to

usurp the value of the Orly Trust TRI Shares.

73.    On September 23, 2008, Sagi, as TPR CEO, released the Sagi Trust from any

liabilities arising from TPR's sale of the Sagi Trust's TRI shares to the Trump Group in

exchange for a purported payment of approximately $7 million.  The Trump Group paid the

---

11. *See TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, Case No. 13-8243, 2014 WL 1979932, at *8 (S.D.N.Y.
    May 15, 2014).

remaining $20 million of the approximately $27 million total that it paid for the Sagi Trust TRI

Shares to the Sagi Trust for Sagi's sole benefit.

74.    Sagi transferred the more than $44 million to offshore accounts in Lichtenstein

and the Cook Islands for his own and/or Dalia's benefit.  Sagi never transferred any of the funds

to Arie or to the Orly Trust (or to Orly as the Orly Trust's beneficiary) despite the intended

distribution of property provided for by the 2004 Stock Purchase Agreement, the Divorce

Settlement, and the subsequent divorce arbitration.

### E.    Sagi's Sham D&K Note Transactions

75.    In January 2009, Dalia, now acting as trustee of the Orly Trust, ratified the 2007

D&K changes.

76.    On January 31, 2009, D&K GP (as general partner of D&K), the Sagi and Orly

Trusts (as limited partners), and TPR memorialized a document called the "Meeting of Partners

of D&K LP – Jan. 31, 2009 & Agreement" (the "2009 D&K Agreement"), in which the parties

purported to agree that D&K GP could sign for D&K and each individual partner when making

the limited partners' assets subject to a pledge.  In the 2009 D&K Agreement, TPR promised that

it would "refrain from enforcing the [D&K Note] against each limited partner for thirty days."

77.    On February 27, 2009, Sagi, again acting as CEO of TPR, conducted an "auction"

at which TPR bought the TPR shares that D&K had used as collateral for the D&K Note.

78.    On February 27, 2009 (which was less than 30 days after the parties entered into

the 2009 D&K Agreement), TPR foreclosed on the D&K Note, and TPR purchased back D&K's

240 TPR shares, decreasing D&K's obligations under the D&K Note, but leaving a balance of

approximately $8.8 million that continued to be nominally guaranteed by the Orly and Sagi

Trusts.

79.    On May 25, 2009, Parnes rescinded the assignment of the D&K Note.

80.    In early 2009, Orly learned that Sagi and Dalia were wrongfully attempting to terminate Orly's indirect interest in TPR through collusive transactions.  If this happened, the Orly Trust and Arie TRI Shares would revert to TPR.  If that occurred, TPR stood to receive the proceeds from the TRI shares' onward sale to the Trump Group.  Orly learned only in early June 2009 that TPR had foreclosed on the D&K Note and that D&K had sold the pledged TPR shares back to TPR.  Orly made a written demand that TPR return the pledged TPR shares to D&K, but TPR refused.  Orly also requested in writing from Dalia, as trustee of the Orly Trust, in January 2009 and again in June 2009, that the Orly Trust retain all of its TRI shares and that the Orly Trust not sell its TRI shares.  Dalia refused to agree or even respond.

81.    In August 24, 2009, Orly therefore brought an action in New York Supreme Court to preserve her interest in TPR, alleging, among other things, that Sagi and Dalia had breached their fiduciary duties to the Orly Trust (the "Orly Supreme Court Action").[12]  Orly alleged that Sagi, with assistance from Dalia, used his control over TPR and D&K GP to engage in self-dealing and cause TPR to foreclose upon the D&K Note and injure the Orly Trust.  On April 8, 2016, the Supreme Court granted Orly's motion for partial summary judgment.  On February 7, 2017, the Appellate Division affirmed.

82.    In July 2010, the Delaware Chancery Court found that the Trump Group controlled TRI based on the Trump Group's ownership of both its own TRI shares and the Sagi Trust TRI Shares.  But the Chancery Court declined to determine the beneficial ownership of the Arie and Orly Trust TRI Shares.

---

12. *Orly Genger v. Dalia Genger, et al.*, Index No. 109749/09 (Sup. Ct. N.Y. Cnty

83.     On July 26, 2010, Arie and Orly initiated another action in New York Supreme Court seeking, among other things, an injunction preventing Sagi or TPR from transferring the Orly Trust or Arie TRI Shares (the "Arie and Orly Supreme Court Action").[13]  On September 22, 2010, Arie and Orly filed an amended complaint, adding the Trump Group, Dalia, Rochelle Fang, as trustee of the Orly Trust, and others as defendants.

84.     In an agreement dated as of September 1, 2010, the interested parties, including the Orly Trust, with Dalia as trustee, Orly "as beneficiary of" the Orly Trust, and TPR, agreed to place into escrow the purchase price of the Orly Trust TRI Shares ($10.3 million) pending a determination of the beneficial ownership of those shares.

85.     In February 2011, the Trump Group exercised its option to buy the Arie TRI Shares.  The purchase price ($7.4 million) was similarly placed into escrow pending resolution of the beneficial ownership of the shares.

86.     In July 2011, the Delaware Supreme Court reversed the Chancery Court's decision authorizing the Trump Group to buy the Orly Trust and Arie TRI Shares.  The beneficial ownership of those shares therefore remained unresolved.

87.     In October 2011, despite the pendency of the Orly Supreme Court Action and the Arie and Orly Supreme Court Actions, Dalia, as trustee of the Orly Trust, initiated another Delaware proceeding against the Trump Group in which she claimed ownership of the Orly Trust TRI Shares ("Dalia's Delaware Action").[14]

88.     Also in October 2011, TPR and Dalia entered into a settlement agreement pursuant to which TPR purported to relinquish its rights to the $10.3 million in proceeds from

---

13. *Arie Genger v. Sagi Genger, et al.*, Index No. 651089/2010 (Sup. Ct. N.Y. Cnty

14. *Dalia Genger v. TR Investors LLC*, C.A. No. 6906 (Del Ch.).

the sale of the Orly Trust TRI Shares in favor of the Orly Trust.  The New York Supreme Court later declared this settlement agreement void.

89.    On October 26, 2011, Orly obtained a temporary restraining order from the New York Supreme Court against Dalia enjoining Dalia from proceeding with the Delaware action or commencing any new actions concerning the subject matter of the Arie and Orly Supreme Court Action (*i.e.*, the Arie and Orly Trust TRI Shares).

90.    On November 1, 2011, TPR purported to adopt a board resolution to release the Sagi Trust from any obligations under the D&K Note.  The New York Supreme Court later adjudged the board resolution void.

91.    On November 9, 2011, the New York Supreme Court entered a temporary restraining order against TPR enjoining TPR from taking any actions concerning the subject matter of the Arie and Orly Supreme Court Action.

92.    In early April 2012, the New York Supreme Court continued the restraining orders pending a decision from the District Court for the Southern District of New York.  At the time, the parties anticipated that the District Court would determine the proper forum and jurisdiction for a decision regarding the beneficial interest in the disputed Arie and Orly Trust TRI Shares.

93.    On June 14, 2012, the District Court stayed its own proceedings in favor of the Arie and Orly Supreme Court Action.[15]

94.    On June 28, 2012, Arie and Orly entered into a Trust Agreement, whereby they transferred and assigned their interests in the various litigations related to the TRI Shares to the

_____

15. *Glencova Inv. Co. v. Trans-Resources, Inc., et al.*, 874 F. Supp. 2d 292 (S.D.N.Y. 2012) (resolving motions in Case Nos. 08 Civ. 7140(JFK), 11 Civ. 5602(JFK), and 11 Civ. 7923(JFK)).

trustees of the trust, for the trustees to hold for the benefit of ADBG, an entity owned by the

Brosers.

95.     On January 2, 2013, the New York Supreme Court granted in part and denied in

part the Trump Group's motion to dismiss Arie's and Orly's complaint in the Arie and Orly

Supreme Court Action.[16]  Arie appealed the decision.

**F.     The Credit Agreement**

96.     On September 19, 2008, Arie and ADBG entered into a credit agreement,

pursuant to which ADBG agreed to lend Arie certain amounts to pay for legal fees and expenses

incurred by Arie related to certain of the litigations concerning the TRI shares (the "Credit

Agreement").[17]

97.     The Credit Agreement also provided, in relevant part, that Arie would pay

ADBG's reasonable fees and disbursements for ADBG's advisors and attorneys related to the

loan documents, ADBG's costs and expenses related to any default or enforcement of the loan

documents, and ADBG's fees and disbursements related to the lawsuits.

98.     The Credit Agreement also provided, in relevant part, that Arie was to repay any

loans thereunder by the September 19, 2015 maturity date.

99.     In March 2012, Arie and ADBG executed a first amendment to the Credit

Agreement.

100.   Between 2008 and 2014, pursuant to the Credit Agreement, as amended, ADBG

loaned Arie and/or expended under the Credit Agreement more than $21 million.

---

16. Amended Decision, No. 651089/2010 (Sup. Ct. N.Y. Cnty. Jan 2, 2013), Doc. No. 285.

17. Specifically, *Glencova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates Inc.*, Case No. 08 Civ. 7140 (JFK) (S.D.N.Y.) and *TR Investors, LLC, Glencova Investment Co., et al., v. Arie Genger, et al.*, C.A. No. 3994-CS (Del. Ch.).

101.  As of the maturity date, Arie had repaid just over $17 million.  Nevertheless, Arie was and remains in material breach of the Credit Agreement, having failed to pay by the maturity date more than $4 million, plus interest and attorneys' fees, due under the Credit Agreement.

### G.    The 2013 Settlement Agreement and the Notes

102.  In June 2013, Arie, Orly (in both her individual capacity and as beneficiary of the Orly Trust), and the Brosers, on the one hand, and the Trump Group, on the other hand (the "Settling Parties"), entered into an agreement to settle claims relating to the Trump Group's entitlement to the TRI shares (the "2013 Settlement Agreement").[18]

103.  Pursuant to the Credit Agreement, ADBG had provided litigation funding to Arie for the various litigations that the 2013 Settlement Agreement settled.

104.  The 2013 Settlement Agreement allocated approximately $50 million in value related to TRI shares.  Specifically, the 2013 Settlement Agreement provided that the Trump Group would release any claims to the $10.3 million for the Orly Trust TRI Shares (which was being held in escrow) and the $7.4 million for the Arie TRI Shares (which also was being held in escrow), and pay an additional $32.2 million.[19]

105.  In early July 2013, the Trump Group paid Arie approximately $17.3 million of the additional consideration.

---

18. At the time of the agreement, the litigations included *Genger v. TR Investors, LLC*, No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR Investors, LLC, et al. v. Arie Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v. Trans-Resources, Inc., et al.*, Case No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger v. Sagi Genger, et al.*, Index No. 651089/2010 Sup. Ct. N.Y. Cnty).

19. As noted above, Sagi was eventually able to secure these escrowed amounts for himself.  *See TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, Case No. 13-8243, 2014 WL 1979932, at *8 (S.D.N.Y. May 15, 2014).  Thus, Sagi was able to secure $27 million from the Trump group for the Sagi Trust Shares, and an additional $17 million for the Orly Trust and Arie Shares, for a total of $44 million.  The District Court declared "the dispute regarding ownership of the Orly Trust Shares … over," *id*. at *6, while also noting that its decision was not announcing "any kind of equitable or normative conclusion as to who among the Genger siblings ultimately deserves recompense," which was an issue that the District Court believed "was left to the state courts to sort out" *id*. at *15.

106.   Under the terms of the Credit Agreement, Arie was required to pay that amount to ADBG.  Arie and Orly also had agreed, pursuant to a 2012 assignment agreement, to pay certain proceeds from ADBG-funded litigations to ADBG via the Genger Litigation Trust.

107.   The remaining $15 million due under the 2013 Settlement Agreement is evidenced by two $7.5 million promissory notes (each a "Settlement Note" and together, the "Settlement Notes").

108.   The first Settlement Note would have matured in 2016, three years after the 2013 Settlement Agreement's execution date.

109.   The second Settlement Note would have matured in 2017, 364 days after the first Settlement Note became due.

110.   However, under the 2013 Settlement Agreement, neither Settlement Note matures until all pending and future claims brought by any of TPR, Sagi, the Sagi Trust, the Orly Trust, D&K, D&K GP, Rochelle Fang, and/or Parnes against any member of the Trump Group have been dismissed with prejudice and the statute of limitations has run with respect to other specified potential claims.

111.   The 2013 Settlement Agreement further provides that Arie and Orly must indemnify the Trump Group for all reasonable costs, expenses, and attorney's fees incurred as a result of, in connection with, or relating in any way to, any pending and future litigation brought by or on behalf of any of TPR, the Sagi Trust, the Orly Trust, D&K, D&K GP, Sagi, David Parnes or Dalia relating in any way, whether directly or indirectly, to, among other things, the 2001 Stockholders Agreement; the October 2004 transfers of interest in TPR and transfer of TRI shares; the Trump Group's acquisition of the Arie TRI Shares, Orly Trust TRI Shares, Sagi Trust

TRI Shares; the Trump Group's control of TRI through its acquisition of the aforementioned

shares; and the 2013 Settlement Agreement (the "Indemnification Provision").

112.   Under the 2013 Settlement Agreement, any amounts that Arie or Orly were

required to pay under the Indemnification Provision would come from the Settlement Notes,

which remain in escrow until maturity.

113.   As of the date of filing this Complaint, the statute of limitations has run with

respect to all specified potential claims under the 2013 Settlement Agreement.

114.   As part of the 2013 Settlement Agreement, the Settling Parties executed a

corresponding stipulation of discontinuance ("Stipulation of Discontinuance").  Orly executed

the stipulation "individually and as a beneficiary of"—but not on behalf of—the Orly Trust.  The

Settling Parties, on notice to Dalia, as trustee of the Orly Trust, submitted the Stipulation of

Discontinuance in the Arie and Orly Supreme Court Action.

115.   On July 1, 2013, the New York Supreme Court (Jaffe, J.) so-ordered the

Stipulation of Discontinuance and approved the 2013 Settlement Agreement after extensive

discussion confirming the limited capacity in which Orly executed the 2013 Settlement

Agreement.[20]

### H.    The Sagi Parties' Interference with the Notes

#### 1.    The Pattern of Duplicative and Baseless Litigations

116.   Having learned of the Credit Agreement and 2013 Settlement Agreement,

including the conditions on the maturity of the Settlement Notes and the Indemnification

Provision, Sagi and other Defendants began pursuing a course of conduct to interfere with

---

20. Second Amended Stipulation of Discontinuance with Prejudice, Index No. 651089/2010 (Sup. Ct. N.Y. Cnty. July 1, 2013), Doc No. 487.

Orly's, Arie's, and the Brosers'/ADBG's rights under those agreements, including to prevent the Settlement Notes from maturing and to bleed the value of the Settlement Notes via the Indemnification Provision.

117.   On September 27, 2013, Sagi and TPR moved to lift the stay that the District Court had imposed in favor of the Arie and Orly Supreme Court Action.  In his November 12, 2013 order denying their motion, Judge Keenan wrote, "everyone acknowledges, the issues raised in these claims were litigated, or are presently being litigated, in [another] court."[21] Nonetheless, Sagi and other Defendants continued re-litigating the 2013 Settlement, with the malicious intent to injure Plaintiffs.

118.   Dalia, for her part, proceeded to re-litigate the 2013 Settlement in the New York Supreme Court.  In ensuing years, Dalia sought at various times to (a) substitute herself for Orly, (b) compel payment of any proceeds from the 2013 Settlement Agreement into the court so that Dalia could collect those proceeds, and (c) challenge the 2013 Settlement as improperly settling derivative claims that belonged the Orly Trust and not Orly individually or as the Orly Trust's beneficiary.  Dalia was unsuccessful on all fronts.

119.   Dalia, as trustee of the Orly Trust, argued to the New York Supreme Court that the 2013 Settlement Agreement released claims that belonged to the Orly Trust, to which Dalia, as trustee, was entitled.  In a March 20, 2014 decision, the New York Supreme Court rejected Dalia's arguments, noting that "[i]n the settlement agreement, Orly stops short of releasing derivative claims."[22]

---

[21.] *Glencova Inv. Co. v. Trans-Resources, Inc., TPR Inv. Assoc., Inc., et al.*, Case No. 08 Civ. 7140 (S.D.N.Y. Nov. 12, 2013), ECF No. 185, at 10.

[22] Decision and Order, Index No. 651089/2010 (Sup. Ct. N.Y. Cnty. Mar. 20, 2014), Doc. No. 925, at 4.

120.   Sagi, Dalia, and other Defendants also needlessly initiated and prolonged actions concerning the 2013 Settlement Agreement and improperly used judicial processes in order to harm Plaintiffs.

121.   Since learning of the 2013 Settlement Agreement, the core allegations of the duplicative challenges brought by Sagi, Dalia, and other Defendants have been the same—that Orly brought and settled derivative claims that belonged to the Orly Trust, and not to Orly individually or as beneficiary of the Orly Trust.

122.   On June 30, 2013, shortly after Dalia and Sagi began interfering with the 2013 Settlement Agreement, the Trump Group's counsel wrote to Sagi's counsel objecting to Sagi's and his counsel's interference, stating,

> [Y]ou and Sagi cannot expect us to sit by while you interfere with and attempt to disrupt the Settlement Agreement we reached with Arie and Orly on grounds that are diametrically opposed to positions that Sagi has taken in court and the contractual obligations of TPR, Sagi and the Sagi Trust. …
>
> Sagi, as President of TPR, negotiated the terms of the sale of the so called "Orly Trust Shares" and then signed the agreement and later the stock powers transferring those shares to our clients. He repeatedly acknowledged on the record that the consideration received for those shares was fair and reasonable. …
>
> Your arguments before Justice Jaffe in opposition to our settlement with Arie and Orly are in direct violation of contractual commitments of TPR, the Sagi Trust and Sagi, and are contrary to Sagi's repeated representations to our client and the courts regarding the effective and appropriate disposition of the Orly Trust Shares on fair, reasonable and acceptable terms. …

123.   On February 20, 2015, Dalia submitted a sworn affidavit to the New York Supreme Court, indicating her disagreement with, and malice toward, the 2013 Settlement

Agreement.[23]   In the affidavit, Dalia recognized the "ill will and litigation in [her] family" and called the 2013 Settlement Agreement "abhorrent" because it would "be used to finance lawyers."

2.      **Dalia's Delaware Action**

124.   Confirming her true understanding that the 2013 Settlement did not settle any of the Orly Trust's claims against the Trump Group, Dalia, as trustee of the Orly Trust, promptly resumed prosecuting her Delaware Action against the Trump Group.

125.   At an August 1, 2013, hearing Delaware Chancery Court Chancellor Strine characterized Sagi's efforts as attempts to collect on a "Powerball ticket," referring to Sagi's windfall as a result of the Gengers' inadvertent breach of the 2001 Stockholders Agreement.

126.   Also in August 2013, Dalia stipulated to the dismissal with prejudice of the Orly Trust's claims against the Trump Group pertaining to the Orly Trust TRI Shares.   On August 30, 2013, the Chancery Court so-ordered the stipulation.[24]

3.      **Sagi's Manufactured Indemnification Claims**

127.   On February 18, 2014, Sagi filed a complaint in the District Court for the Southern District of New York against Orly for alleged breach of an indemnification agreement.[25]   Sagi alleged that, on October 30, 2004, in connection with Dalia's divorce from Arie, Sagi promised to support Dalia up to the value of 794.4 of the TRI shares that he and Orly (via their respective trusts) were receiving in connection with the divorce (the "2004 Support Agreement").   Sagi also alleged that, pursuant to a separate November 10, 2004 letter agreement,

---

23. Affidavit of Dalia Genger, Index No. 651089/2010 (Sup. Ct. N.Y. Cnty. Feb. 20, 2015), Doc. No. 1242.

24. *Dalia Genger v. TR Investors, LLC, et al.*, C.A. Case No. 6906-CS (Del. Ch. Aug. 30, 2013).

25. Complaint, *Sagi Genger v. Orly Genger*, Case No. 14-cv-01006 (S.D.N.Y. Feb. 18, 2014), ECF No. 2.

Orly had agreed to indemnify and reimburse Sagi for 50% of any monies that Sagi paid to Dalia pursuant to the 2004 Support Agreement (the "2004 Indemnification Agreement"). The complaint alleged that the District Court had diversity jurisdiction because Sagi was a citizen of Connecticut and Orly was a citizen of New York.

128. On May 20, 2014, in the Arie and Orly Supreme Court Action, Orly moved for an order of attachment under section 6201 of the New York Civil Practice Law and Rules against Sagi and a corporate entity that he controlled.[26] As one of the grounds for attachment, Orly asserted that Sagi's domicile was not New York, citing the February 18, 2014 complaint.

129. On May 22, 2014, in response to Orly's section 6201 motion, Sagi submitted an affidavit stating that he resided in New York.[27]

130. On July 22, 2014, the District Court dismissed the February 18, 2014 complaint without prejudice for lack of subject matter jurisdiction, finding that Sagi had not, as he alleged in the complaint, actually been domiciled in Connecticut when he filed the complaint.[28]

131. On July 24, 2014, Sagi filed a second, nearly identical complaint against Orly in the District Court, again alleging that Orly had breached the 2004 Indemnification Agreement.[29] The complaint alleged that, on or around January 22, 2014, Dalia demanded $200,000 from Sagi under the 2004 Support Agreement, and that Sagi subsequently paid Dalia that amount. The complaint further alleged that, on February 17, 2014, Sagi demanded $100,000 from Orly under the 2004 Indemnity Agreement, and that Orly refused to pay.

---

26. *Genger v. Genger*, Index No. 651089/10 (Sup. Ct. N.Y. Cnty.), Doc. Nos. 932, 961.

27. *Genger v. Genger*, Index No. 651089/10 (Sup. Ct. N.Y. Cnty.), Doc. No. 1004.

28. Order, *Sagi Genger v. Orly Genger*, Case No. 14-cv-01006 (S.D.N.Y. July 22, 2014), ECF No. 52.

29. Complaint, *Sagi Genger v. Orly Genger*, Case No. 14-cv-05683 (S.D.N.Y. July 24, 2014), ECF No. 1.

132.   In response, Orly challenged the enforceability of alleged 2004 Indemnity Agreement because it lacked consideration.[30]

133.   However, on January 5, 2015, District Court Judge Forrest found that Orly had "effectively monetized" the TRI shares when she signed the 2013 Settlement Agreement, and thus, Orly had made an enforceable agreement to indemnify and reimburse Sagi for 50% of all monies paid by Sagi to Dalia for support.[31]

134.   On September 29, 2016, the Second Circuit affirmed the District Court's decision, but the Second Circuit noted that it did so only because the 2013 Settlement Agreement was supported by consideration because it conferred upon Orly "more than a peppercorn, which is all we need to conclude (*and all we do conclude*) as to the extent of any benefit she received."[32]

135.   Neither the District Court nor the Second Circuit addressed the Settlement Notes' extended maturity dates, the Indemnification Provision, or whether Orly received any proceeds from the 2013 Settlement Agreement.

136.   While the District Court opinion was on appeal to the Second Circuit, the New York Supreme Court held a trial on the fraud claim that Orly had brought in 2008 against Sagi.

137.   On February 10, 2016, the New York Supreme Court ruled that Sagi had made material misrepresentations to defraud Orly and that he was not credible.[33]

---

30. As noted above, pursuant to the 2004 Divorce Agreement, the Orly Trust and the Sagi Trust each received a total of 1,102.8 TRI shares.

31. Opinion & Order, Case No. 14-cv-05683 (S.D.N.Y. Jan. 5, 2015), ECF No. 94.

32. *Genger v. Genger*, 663 F. App'x 44, 49 (2d Cir. 2016) (emphasis added).

33. *Genger v. Genger*, Index No. 100697/08, 2016 WL 551444 (Sup. Ct. N.Y. Cnty. Feb. 10, 2016).

138.   On November 29, 2016, the Appellate Division, First Department, affirmed the Supreme Court's decision, and remanded the case to the Supreme Court for a determination on damages.[34]

139.   On April 8, 2016, in a related New York Supreme Court action that Orly had commenced in 2009, the court granted summary judgment in Orly's favor against Sagi.[35]   The Supreme Court held that Sagi had breached his fiduciary duties to D&K and the Orly Trust by using his control over D&K GP and TPR to enter into self-dealing transactions to strip D&K of its TPR shares, thereby injuring D&K and the Orly Trust.   On February 7, 2017, the Appellate Division, First Department affirmed the Supreme Court's decision.[36]

140.   Through prior court proceedings, Orly uncovered evidence that Sagi had secreted millions of dollars that he had received from the Trump Group to offshore tax havens, including Liechtenstein and the Cook Islands.

141.   In 2016, Dalia testified in the New York Supreme Court proceeding.   On cross examination, she admitted that she had millions of dollars secreted in offshore accounts and that she relied entirely on Sagi and trusted him implicitly to manage her money.   She also admitted, under oath, that, at the time of the 2014 Indemnification Complaint, she had at least $3 million.

142.   That testimony contradicted prior statements by Dalia, as well as Sagi's prior representations that, as of 2014, Dalia was destitute and in need of the $200,000 she had demanded to "support her lifestyle."

---

34. *Genger v. Genger*, 144 A.D.3d 581 (1st Dep't 2016).

35. *Genger v. Genger*, Index No. 109749/09, 2016 WL 1407903 (Sup. Ct. N.Y. Cnty. Apr. 8, 2016).

36. *Genger v. Genger*, 147 A.D.3d 443 (1st Dep't 2017).

143.   Despite these contradictions, on October 24, 2017, Dalia brought a new action in the District Court for the Southern District of New York against Sagi, alleging that, on October 21, 2017, she had made a second written demand to Sagi for $6 million under the 2004 Support Agreement and that Sagi had refused to pay (the "$6 Million Indemnification Action").[37]

144.   The court did not issue a summons to Sagi that day because Dalia's attorney neglected to include Sagi's name on the summons.  Nonetheless, Sagi filed an answer and third-party complaint against Orly the same day alleging that, pursuant to the 2004 Indemnity Agreement, Orly owed him $3 million of the $6 million that Dalia had demanded.

145.   On December 14, 2017, the $6 Million Indemnification Action was transferred to Judge Forrest who, on July 27, 2018, reaffirmed her earlier opinion and found for Sagi, despite noting that "[i]t certainly appear[ed], based on the timing of the pleadings and certain similarities in the language used, that there was some coordination between Dalia and Sagi," and that various "factors suggest[ed] that Dalia and Sagi may have more in common than they let on."[38]

146.   On July 18, 2018, Judge Forrest announced her retirement, effective September 11, 2018.  Upon her retirement, the $6 Million Indemnification Action was transferred to Judge Broderick.

147.   On April 10, 2019, Dalia filed a Partial Satisfaction of Judgment in the $6,000,000 Indemnification Action, alleging that, on March 26, 2019, Sagi made a partial payment to Dalia in the amount of $150,000.  However, when questioned at a deposition, Sagi would not confirm that he had actually paid Dalia this amount.

---

37. *Dalia Genger v. Sagi Genger*, Case  No. 17-cv-8181 (S.D.N.Y.).

38. Opinion & Order, *Dalia Genger v. Sagi Genger*, Case No. 17-cv-08181 (S.D.N.Y. July 27, 2018), ECF No. 101.

148.   On July 12, 2019, after broad discovery into Orly's assets in the $6 Million Indemnification Action, Orly filed a Chapter 7 bankruptcy petition.

149.   On July 23, 2019, Judge Broderick ordered the $6 Million Indemnification Action stayed.

4.      **The Surrogate's Court Action**

150.   On or about June 13, 2016, shortly before the first Settlement Note would have become due, Dalia, as trustee of Orly Trust, filed a petition for turnover of trust property in the New York Surrogate's Court, alleging that Orly had improperly instituted and settled the Arie and Orly Supreme Court Action because it complained of, and released, derivative claims that belonged the Orly Trust and not to Orly individually or as the Trust's beneficiary.[39]

151.   In or about January 2018, Dalia attempted to add members of the Trump Group as parties to the Surrogate's Court proceeding.  This extended the maturity date of the first Settlement Note.

152.   Dalia brought these allegations despite the fact that both the New York Supreme Court and the Delaware Chancery Court had rejected the same allegations.

153.   Throughout the proceedings, the Surrogate's Court raised concerns over the Trump Group's involvement in the matter and, on March 29, 2018, asked Dalia's counsel to propose a solution.

154.   In response, Dalia would agree to remove the Trump Group from the Surrogate's Court action only if the Trump Group agreed to withhold payment of the Settlement Notes until the Surrogate's Court issued a final, non-appealable judgment.  The Trump Group declined.

---

39. *Dalia Genger v. Orly Genger, et al.*, Index No. 2008-0017/E (N.Y. Surr. Ct. June 13, 2016).

155.   Dalia's proposal evidenced her improper motives in filing the Surrogate's Court petition and using the maturity and indemnification provisions of the 2013 Settlement Agreement as leverage.

156.   On or about April 12, 2018, Dalia filed an amended petition in the Surrogate's Court.  Like the initial petition and the claims that had previously been litigated in New York Supreme Court and Dalia's Delaware Action, the amended petition alleged that Orly had improperly instituted and settled the Arie and Orly Supreme Court Action because Orly complained of, and released, derivative claims that belonged the Orly Trust and not to Orly individually or as a beneficiary of the Trust.  The amended petition included seven counts.  The first four were substantive claims for breach of fiduciary duty, tortious interference with a trust agreement, money had and received, and unjust enrichment.  Dalia asserted those claims against only Orly, Arie, Arnold Broser, and David Broser.  The last three counts were requests for turnover, an injunction, and an accounting.  Dalia requested turnover from all respondents, an injunction against the Trump Group, and an accounting from Orly.

157.   Dalia's Surrogate's Court claims against the Trump Group remain pending and continue to prevent maturity of the Settlement Notes.

158.   After motion practice, but prior to any decision, on June 20, 2019, the Surrogate's Court action was removed to the Bankruptcy Court overseeing Orly's bankruptcy.  Oldner, as trustee of the Orly Trust, moved to have the case remanded to the Surrogate's Court.  That motion remains pending.

I.    **The Inter-Creditor Agreement, Recovery Effort, and Manhattan Safety**

159.   By January 2019, Sagi, Dalia, and others were aware that Orly planned to file for

bankruptcy, thus raising the potential that a bankruptcy court would permanently enjoin the

pending cases that were holding-up the Settlement Notes.

1.    **The June 2019 Acts.**

160.   With Orly's bankruptcy looming, Sagi and other Defendants hatched a new plan

to eventually assert $9.25 million of new indemnification claims against Orly, to continue to

assert challenges to the 2013 Settlement Agreement, and to continue to hold up payment of the

Settlement Notes and Arie's repayments under the Credit Agreement.  Sagi and other Defendants

created new entities controlled by them, purported to assign their claims to those entities, entered

into an "Inter-Creditor Agreement" providing for the sharing of any proceeds from such claims

among them, left the Surrogate's Court claims pending against the Trump Group and Orly, and

instituted new actions against certain of the non-debtor Plaintiffs here.

161.   On June 4, 2019, Sagi and Dalia, through TPR and the Orly Trust, which Dalia

continued to control as trustee, incorporated Recovery Effort in Arkansas.  The Orly Trust

wholly owns Recovery Effort.

162.   On June 11, 2019, while the Inter-Creditor Agreement was being negotiated, Sagi

filed a motion for turnover in the $6 Million Indemnification Action, claiming that the 2013

Settlement proceeds belong to Orly individually, and that the District Court should compel

garnishees/transferees Michael Bowen, Arie, and Tedco, Inc. (together with its control persons

and intermediaries) to turn over promissory notes and funds in which Orly has an interest

sufficient to satisfy Sagi's judgment, and rescind all allegedly fraudulent conveyances associated

therewith (the "Turnover Motion").

163.   On June 12, 2019, Robin Rodriguez incorporated Manhattan Safety in Maine.

164.   Also on June 12, 2019, Dalia purported to resign as trustee of the Orly Trust and appointed Michael Oldner as her successor.  Dalia appointed Oldner despite never having met or spoken with him, or even having attempted to do so, and, upon information and belief, having performed no due diligence whatsoever regarding Oldner's qualifications.  Dalia also failed to seek leave of the Surrogate's Court despite the fact that Orly's action to remove Dalia as trustee had been pending before that court for a decade.

165.   Oldner later admitted during a June 25, 2020 deposition that he performed no investigation into the Orly Trust before accepting the trusteeship.

166.   Upon information and belief, Oldner's appointment was conditioned on his agreement to deliver the August 2019 Releases, discussed *infra*.

167.   On June 13, 2019, Dalia, still acting as trustee despite her resignation, purported to assign the Orly Trust's claims to herself, as sole director of the Recovery Effort, for no stated consideration.

168.   In or about June 2019, Robin Rodriguez introduced Sagi to Oldner.  In or about 1989 and 1990, Rodriguez had employed Oldner at a broker-dealer in Little Rock, Arkansas.  In or about April 2019, Rodriguez first broached the subject of Oldner becoming the trustee of the Orly Trust.

169.   In June 2019, Sagi and Oldner spoke by phone several times to discuss the Genger litigations and the plan to commence additional litigations based on the same set of facts.

170.   On June 14, 2019, Sagi and Oldner met for the first time at Community Bakery in Little Rock, Arkansas.

171.    On June 16, 2019, Sagi, TPR, the Orly Trust (through Oldner), Recovery Effort, and Manhattan Safety entered into the Inter-Creditor Agreement, with Sagi's longtime counsel John Dellaportas (now at Emmet, Marvin & Martin LLP) as "escrow agent."

172.    On June 17, 2019, five days after Dalia purportedly resigned as trustee of the Orly Trust, four days after Dalia purportedly assigned the Orly Trust's claims to Recovery Effort, and three days after Oldner purportedly became trustee, Dalia's counsel, Judith Bachman, as "counsel to Dalia Genger, Trustee of the Orly Genger 1993 Trust," stated in a letter to counsel for Orly, Arie, David Broser, ADBG, and the Trump Group that Dalia would deliver a release to the Trump Group if all of the Disputed Settlement Proceeds were delivered to the Orly Trust.

173.    Later that same day on June 17, 2019, Manhattan Safety filed a complaint in the District Court for the Southern District of New York against Arie, David Broser, Arnold Broser, ADBG and related persons.[40]

174.    The complaint alleged diversity jurisdiction based on Manhattan Safety's purported Maine citizenship, despite the fact that the defendants are citizens of New York, and Manhattan Safety's only significant asset is TPR's claim, and TPR's principal place of business is New York.

175.    On June 20, 2019, Oldner was purportedly installed as trustee despite having no experience acting in that capacity and not being a lawyer; in fact, Oldner had not even graduated from college.  Oldner purportedly accepted the position without seeking any compensation for the work.  Oldner purportedly accepted the position despite having conducted no independent

---

40. Complaint, *Manhattan Safety Maine, Inc., et al. v. Bowen, et al.*, Case No 19-cv-5642 (S.D.N.Y. June 18, 2019), ECF No. 5.

inquiries or investigation prior to taking on the role, other than reading the Orly Trust trust agreement and certain court documents.

176.   After taking on the role, upon information and belief, Oldner still made essentially no efforts of his own to investigate the interests and positions of the Orly Trust and its beneficiaries other than speaking to Sagi, the person in the world perhaps most adverse to Orly, the primary beneficiary of the trust.

177.   Instead, upon information and belief, Oldner acted at Sagi's direction, filing motions and other documents that Sagi directed him to file, signing documents that Sagi directed him to sign, granting releases that Sagi and Parnes directed him to grant, and otherwise acting for the benefit of Sagi and Dalia, and not for the benefit of the Orly Trust or its beneficiaries, but, in fact, often acting against those interests.

178.   On June 20, 2019, the Orly Trust, via Dalia as "outgoing trustee" and Oldner as trustee, voluntarily discontinued without prejudice its action in the Surrogate's Court against Arie, Arnold Broser, and David Broser.  It left claims against Orly and it purposefully left claims against the Trump Group pending in order to prevent maturity of the Settlement Notes.

179.   Dalia allegedly took all of these actions in or around June 2019 despite claiming (i) never to leave her apartment, and (ii) to be incapacitated.

180.   Manhattan Safety's and Recovery Effort's claims against Arie, Arnold Broser, and David Broser are essentially the same as those that the Orly Trust, via Dalia, asserted against them in the Surrogate's Court.

181.   Like the Surrogate's Court Petition, as well as the claims and defenses in the New York Supreme Court actions and Dalia's Delaware Action, Manhattan Safety's and Recovery Effort's core allegations are that Orly brought the Arie and Orly Supreme Court Action

derivatively on behalf of the Orly Trust, and that the 2013 Settlement Agreement wrongfully resolved various disputes concerning the Orly Trust's beneficial ownership of TRI shares. Manhattan Safety and Recovery Effort ignore Dalia's voluntary discontinuance of the Orly Trust's claims to beneficial ownership of the TRI shares in the Delaware action (discussed above), which vitiates these claims.

182.   The Manhattan Safety/Recovery Effort complaint alleges that Manhattan Safety was harmed because, at the time of 2013 Settlement, the Orly Trust was indebted to TPR, Manhattan Safety's assignor.  The Orly Trust's debt supposedly arises out of the D&K Note. However, as discussed above, the New York Supreme Court and the Appellate Division determined that the Orly Trust's indebtedness to TPR arising out of the D&K Note was the product of self-dealing and a breach of fiduciary duty.  Moreover, as stated above, Parnes and Sagi have admitted that the D&K Note is worthless.

183.   On June 19, 2019, Recovery Effort filed a complaint against Zeichner Ellman & Krause LLP and Wachtel Missry LLP.[41]

184.   Just like the arguments made in the New York Supreme Court actions, Dalia's Delaware Action, the Surrogate's Court action, and the Manhattan Safety action, Recovery Effort alleges that the Orly Trust is entitled to the proceeds of the 2013 Settlement because, through that settlement, Orly improperly released derivative claims that belonged to the Orly Trust.

2.   **The Inter-Creditor Agreement**

185.   The Inter-Creditor Agreement provides that the Orly Trust's "principal asset is its claim to the $32.3 million in litigation proceeds . . . accruing under" the 2013 Settlement and

---

41. *Recovery Effort Inc. v. Zeichner Ellman & Krause LLP, et al*., Case No. 19-cv-5641 (S.D.N.Y.).

provides for the sharing of the proceeds of actions to obtain that asset among Sagi, Manhattan

Safety, and Recovery Effort.

186.   Pursuant to the Inter-Creditor Agreement, TPR, which was and still is controlled

by Sagi, purported to assign to Manhattan Safety, which was and still is controlled by Sagi's

business partner, "all of TPR's right, title and interest to any funds owed it by the [Orly Trust] as

a result of the [D&K] Note."

187.   Section 2(a) of the Inter-Creditor Agreement provides that any recovery relating

to the Disputed Settlement Proceeds shall be distributed among the parties thereto in the

following order of priority: first, in equal amounts to Sagi and Manhattan Safety (TPR's

"assignee") until Manhattan Safety has been paid in full for its claim to no less than $8 million

under the D&K Note, or Sagi has been paid in full for his then current and future indemnification

claims against Orly (which the agreement states include a 2018 judgment against Orly "in the

amount of $3,219,698 plus 50% of [Sagi]'s reasonable counsel and other professional fees,

expenses and costs in connection with this action, in an amount to be determined" plus $9.25

million in potential future indemnity claims that Sagi "expects that, upon availability of funds,

[Dalia] will make demand of [Sagi] on her full remaining entitlement under [Sagi]'s promise to

[Dalia], which will in turn trigger [Sagi]'s entitlement from [Orly] under the OG Indemnity

Claim" [i.e., the 2004 Indemnity Agreement]) "in each case inclusive of all documented

collection costs therefor"; second, to pay any other amounts owed to Manhattan Safety and Sagi

with respect to the claims identified in the prior section to the extent not paid thereunder; and

third, to Recovery Effort.

188.   Accordingly, the Inter-Creditor Agreement fails to provide for any recovery to the

Orly Trust, and instead divides up any potential recoveries primarily among Sagi and Manhattan

Safety, which is controlled by Sagi's business partner and has no other business operations other than pursuing the claims it was assigned by TPR (Sagi).  Pursuant to the Inter-Creditor Agreement, Sagi and Manhattan Safety would share in the first $20,469,698 plus collection costs (including attorneys' fees, which presumably total in the millions of dollars after more than a decade of Genger family litigation) in any recovery from the $32.3 million of Disputed Settlement Proceeds, which amount is subject to set offs for legal fees incurred by the Trump Group – fees that were inflated by the wrongful conduct of Defendants.

189.   On July 14, 2019 (just two days after the commencement of this Chapter 7 Case), Sagi, TPR (by Sagi), Manhattan Safety, Recovery Effort and the Orly Trust (the latter two of which by Oldner), entered into an agreement that provides as follows: "This is to clarify that calculation of amounts owed under the Inter-Creditor Agreement previously executed will be done without respect to any discharge in any bankruptcy proceedings."

### J.   Orly's Bankruptcy and Purported Releases of the Orly Trust's Claims

190.   On July 12, 2019, Orly commenced a voluntary case under Chapter 7 of the Bankruptcy Code (the "Chapter 7 Case") in the United States Bankruptcy Court for the Western District of Texas.[42]

191.   The Texas Bankruptcy Court set a claims bar date of December 9, 2019 and appointed a Chapter 7 trustee for the estate.

192.   On or about August 15, 2019, the same date as Orly's section 341 meeting in Austin, Texas, Parnes – a resident of Israel – upon information and belief, hand delivered separate forms of releases to Oldner in Austin, Texas, each of which is discussed below and

---

42. *In re Orly Genger*, Case No. 19-10926 (Bankr. W.D. Tex. 2019).

which collectively comprise and are defined herein as the August 2019 Releases.  Oldner then

promptly signed each of the August 2019 Releases on the same date.

193.   On or about August 15, 2019, Oldner purported to release Dalia, as prior trustee

of the Orly Trust, from any and all actions, claims, causes of actions, suits, debts, and judgments

with respect to the Orly Trust and Dalia's actions as trustee thereof (the "Dalia Release").

Specifically, the Orly Trust granted a release, on behalf of the "Releasors" the Orly Trust and

"any entity under [the Orly Trust's] control (including, but not limited to, Recovery Effort Inc.),"

to "Dalia Genger and her successors, executors, agents and assigns ('Releasee'), from any and all

actions, causes of actions, suits, debts, dues, sums or money, accounts, reckonings, bonds, bills,

specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses,

damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or

equity, and also any claims with respect to the [Orly Trust] and any and all accountability,

liability and responsibility of Releasee for Releasee's acts or omissions, Releasor ever had, now

has or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing

whatsoever from the beginning of the world to the day of the date of this Release."

194.   On or about August 15, 2019, Oldner also purported to release Sagi and his wife,

Elana Genger (the "Sagi and Elana Release"), as well as Parnes (the "Parnes Release"), from any

and all claims, causes of action, suits, debts, and judgements with respect to the Orly Trust.

Specifically, the Orly Trust granted a release, on behalf of "Releasors" the Orly Trust and "any

entity under [the Orly Trust's] control (including, but not limited to, Recovery Effort Inc.)," to

"Sagi Genger, Elana Genger and their successors, executors, agents and assigns, trusts or other

entities of which they were or are beneficiaries ('Releasee'), from any and all actions, causes of

actions, suits, debts, dues, sums or money, accounts, reckonings, bonds, bills, specialties,

covenants, contracts, controversies, agreements, promises, variances, trespasses, damages,

judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity,

and also any claims with respect to the [Orly Trust] and any and all accountability, liability

responsibility of Releasee for Releasee's acts or omissions, Releasor ever had, now has or

hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever

from the beginning of the world to the day of the date of this Release."

195.   Finally, on or about August 15, 2019, Oldner also purported to release TPR and

D&K GP, and Manhattan  Safety Maine indirectly in its capacity as an assignee of certain causes

of action from TPR, from any and all actions, claims, causes of actions, suits, debts, and

judgements with respect to the Orly Trust (the "TPR and D&K GP Release" and together with

the Sagi and Elana Release, the Parnes Release, and the Dalia Release, the "August 2019

Releases")).  Specifically, the Orly Trust granted the TPR and D&K GP Release on behalf of the

"Releasors" the Orly Trust and "any entity under [the Orly Trust's] control (including,  but  not

limited  to,  Recovery  Effort  Inc.)," to "TPR  Investment Associates, Inc., a Delaware

corporation, D&K GP LLC, a Delaware corporation [sic], and their respective principals,

officer, directors, partners, members, subsidiaries and each of their successors, executors, agents

and assigns ('Releasee'), from any and all actions, causes of actions, suits, debts, dues, sums of

money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies,

agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims,

and demands whatsoever, in law, admiralty or equity, and also any claims with respect to the

Orly Genger 1993 Trust and any and all accountability, liability and responsibility of Releasee

for Releasee's acts or omissions, Releasor ever had, now has or hereafter can, shall or may have

for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Release."

196.   The August 2019 Releases also purport to release any claims that the beneficiaries of the Orly Trust might have had against Dalia, Sagi, and Elana Genger, Parnes, TPR, D&K GP, and other unnamed released parties.  Specifically, both releases define the term "Releasor" to include the Orly Trust "and all of its trustees, directors, officers, employees, agents, affiliates, successors, assigns and beneficiaries, whether or not currently in being, and such beneficiaries' agents."

197.   Oldner granted the August 2019 Releases without conducting any investigation regarding Dalia's actions as trustee or the actions of Parnes, Sagi or Elana Genger, or any other released party, with respect to the Orly Trust.

198.   On the date of the August 2019 Releases, Orly was a Chapter 7 debtor and a beneficiary of the Orly Trust.  Thus, the August 2019 Releases purport to release claims of Orly and her bankruptcy estate.  Oldner and the Orly Trust were aware of the pendency of the Chapter 7 Case prior to granting the August 2019 Releases.  However, Oldner did not consult the debtor or the Texas Chapter 7 trustee before purporting to grant the August 2019 Releases on Orly's behalf.

199.   In addition, prior to providing the August 2019 Releases, Oldner and the Orly Trust were aware that Orly had asserted numerous claims and lawsuits against Dalia and Sagi, among others, and that such claims remained pending and were assets of Orly's bankruptcy estate.

200.   Despite his awareness of the pendency of this Chapter 7 Case and the pendency of Orly's claims, Oldner, on behalf of the Orly Trust, willfully failed to seek approval of the Texas

Bankruptcy Court (where the Chapter 7 Case was then pending) or relief from the automatic stay before granting the August 2019 Releases. Oldner and the Orly Trust also failed to consult with or seek consent from Orly, the Texas Chapter 7 trustee, or any of the other Plaintiffs before granting the August 2019 Releases.

201. Pursuant to 11 U.S.C. § 362(a)(3), Orly's commencement of the Chapter 7 Case resulted in an automatic stay applicable to all persons and entities of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

202. Because the August 2019 Releases purport to release claims of the Debtor, Oldner's and the Orly Trust's granting of the August 2019 Releases constituted an act to obtain possession of property of the estate, to obtain property from the estate, or to exercise control over property of the estate in violation of 11 U.S.C. § 362(a)(3).

203. Upon information and belief, as the targets of the claims subject to the August 2019 Releases, Defendants Dalia, Sagi, and Elana Genger, Parnes, TPR and D&K GP, as well as other generically identified but unnamed released parties (*e.g.*, assigns, trusts), acted in concert with Oldner and the Orly Trust in effectuating the granting of the August 2019 Releases, and demanded that Oldner grant the August 2019 Releases to them as a condition to Oldner's purported appointment as trustee of the Orly Trust.

204. Upon information and belief, Oldner agreed to these demands and granted the August 2019 Releases as a *quid pro quo* for his purported appointment as trustee of the Orly Trust.

205.   On November 7, 2019, the Texas Bankruptcy Court ordered the Chapter 7 Case transferred to this Court.[43]

206.   This Court appointed a new Chapter 7 trustee for the estate.

207.   On December 9, 2019, TPR, D&K GP, Dalia, Sagi, and the Orly Trust, among others, all submitted proofs of claim in the Chapter 7 Case.

208.   Dalia claims that she does not leave her home.  She has never provided any indication that she has a legitimate need for funds to support her lifestyle.  Nonetheless, on December 2, 2019 (one week before the bar date in the Chapter 7 Case), Dalia purportedly made a demand that Sagi pay her $18.5 million under the 2004 Support Agreement.  Dalia made this request in bad faith at Sagi's direction, as part of his scheme to extract payment from the Debtor and other Plaintiffs, and not because she has any need for such money.  As stated above, the June 2019 Inter-Creditor agreement provided that Sagi expected his mother to make this demand at a future date and even identifies the exact dollar amount ($9.25 million) of the claim he expected to make against Orly as a result of this demand (for one half of Dalia's $18.5 million claim to him).  This is no coincidence; rather, this has been a long planned attack on Orly conceived by the Defendants and executed days before the bar date in this Chapter 7 Case.

209.   On December 5, 2019, Dalia and Sagi purported to enter into a "Settlement Agreement" whereby Sagi consented to entry of judgment against him in any court, and Dalia agreed to relinquish any further claim to make demands under the 2004 Support Agreement.

210.   Sagi nonetheless subsequently increased his claim in the Chapter 7 Case to more than $12 million, making clear that he intends to try to secure every penny out of the 2004 Indemnification Agreement, regardless of Dalia's actual need for any funds.  Sagi's claim

---

43. No. 19-13895.

consists of (1) the $3 million judgment he obtained from the District Court, plus pre- and post-judgment interest, as well as attorney fees and costs; (2) $9.25 million in additional funds that the Debtor purportedly owes Sagi under the 2004 Indemnification Agreement, plus interest; and (3) several thousand dollars for certain other fees and costs that Sagi purportedly incurred in pursuing his claims.

### K.    Theft of Orly's Personal Confidential Information[44]

211.    To further their unlawful scheme against Orly, Sagi, together with and through his longstanding attorneys Parnes and Dellaportas, illegally and surreptitiously obtained Orly's personal and confidential Israeli travel and banking records as well as the personal and confidential travel and banking records of her husband, creditor Eric Herschmann ("Herschmann") in September 2019, so that Dellaportas could use the information in this proceeding. Parnes, an Israeli attorney, hired an investigator in Israel to carry out this unlawful theft of private information knowing that this information could not be obtained legally. The unlawfully obtained private information was memorialized in two "reports" the Israeli investigator prepared and provided to Sagi and his counsel (the "Orly Report" and the "Herschmann Report"). Meanwhile, Sagi's American counsel, who is not admitted to the Israeli bar, falsely represented to this Court that "this type of information on account holders is commonly available" in Israel. As Orly has proven in court in Israel, what Sagi, Parnes and Dellaportas did was in blatant violation of applicable Israeli civil and criminal privacy protection laws.

---

[44] Allegations in this Section V.K are made solely by Plaintiff Orly Genger individually, and by no other plaintiffs herein.

212.    Sagi, Parnes and Dellaportas went to great lengths to cover up and conceal their illegal conduct from, among others, this Court, the Israeli authorities and courts and Orly, including by, among other things, misusing the subpoena power of this Court, as set forth further below, and making numerous knowingly false and deceitful statements to this Court.

213.    Sagi sought to use Orly's private information in this Chapter 7 Case.  In particular, Dellaportas, on behalf of Sagi, claimed in this case that Orly failed to disclose an Israeli bank account in her bankruptcy schedules.  This claim was knowingly false.  Sagi and Dellaportas initially failed to disclose the basis for their outrageous claims, even though they insisted this type of information was "highly material" to the bankruptcy proceeding.

214.    Sagi eventually produced a purported translation of the Orly Report.  The translation which included the original Hebrew text, was itself intentionally deceitful, as it omitted the identity and contact information of the investigator and his firm, so that Sagi and Dellaportas could keep their illegal conduct secret.

215.    After more demands were made by Orly's attorney, Sagi and his counsel eventually produced the original Hebrew report, which was addressed directly to Sagi and contained the identity of the investigator and his contact information.  The disclosure of his identity led to the unraveling of Sagi, Parnes and Dellaportas' deceitful and unlawful scheme to obtain Orly's and her husband's personal information, notwithstanding their efforts to cover it up by fabricating a falsehood that her husband and her lawyers had threatened the investigator.

216.    On September 20, 2019, Sagi falsely told the original Chapter 7 trustee in this proceeding that the investigator had been "threatened" by Orly's Israeli counsel, and therefore could not help confirm the details concerning the balance of the bank account.  The investigator

was never threatened.  In fact, communications between him and Orly's counsel confirm that he was "happily" willing to meet with counsel.

217.    On September 23, 2019, Orly's Israeli counsel and Herschmann met with the investigator in Israel, who voluntarily attended the meeting after checking with his client to confirm that there were no objections to him doing so.  The investigator recorded the meeting, a fact known to all present.  Herschmann told the investigator to retain and not destroy the recording.

218.    During the meeting, Herschmann learned for the first time that the investigator had obtained, without any court order, subpoena or Herschmann's consent, Herschmann's confidential travel and banking records as well.

219.    Orly commenced a legal proceeding against the investigator in Israel.  At trial, Sagi's investigator claimed "good faith" as a defense to charges of violating Orly's privacy under the laws of Israel because he and Sagi's lawyers were supposedly gathering evidence for use by Sagi in this Chapter 7 Case and the investigator was a "witness" who Sagi intended to call to testify in this U.S. proceeding.  As evidence for this "defense," the investigator offered a previously undisclosed Rule 45 U.S. trial subpoena (the "Secret Subpoena") issued by Sagi's U.S. counsel (Dellaportas) in this proceeding, requiring Sagi's Israeli investigator to appear at a hearing scheduled for October 2019 in Texas and to produce "all documents relating in any way to Orly Genger or Eric Herschmann" (obviously referring to both the Orly Report and the Herschmann Report).

220.    But this "defense" was a ruse.  In his statement to the Israel National Police, Sagi's investigator claimed he learned that he was supposedly a "witness" only *after* the September 23 meeting with Herschmann.  He learned this from Sagi's Israeli counsel, Parnes,

who told him not to provide Herschmann with a copy of the Herschmann Report – not because it was privileged or work product, but because the investigator was a "witness" in the U.S. proceedings.

221.    It was thus revealed that Dellaportas, working in conjunction with Sagi and Parnes, had issued the Secret Subpoena demanding both the Orly and the Herschmann Reports and the audio recording of the meeting amongst their investigator and Orly's counsel and her husband.  Yet, during the March 4, 2020 proceeding before this Court, Dellaportas falsely told the Court that he had no knowledge of any report concerning Herschmann.

222.    Dellaportas was soon forced to admit that he had misled the Court.  His explanation for doing so was that he "was asked unexpectedly about it."  His misrepresentation to the Court is belied by the record and by his issuance of the Secret Subpoena many months earlier.

223.    At a hearing on September 18, 2020, Dellaportas doubled down on his falsehood. Instead of admitting that the investigator had obtained private information unlawfully, he offered that the investigator could have discovered the private bank information by tailing Orly or Herschmann on their way to the bank, an impossibility considering that Orly's account was closed fifteen years before the investigator had been hired.  Dellaportas also falsely repeated to this Court his fabricated claim that Herschmann had threatened the investigator, telling that Court that Herschmann and his attorney "cornered this guy in an office, and they scared the wits out of this guy, and as a result of which, since that meeting with Mr. Herschmann he doesn't want to talk to us anymore."  Despite telling this to the Court, Dellaportas knew that all of the evidence, including the recording of the meeting, proves that his description of what transpired is fabricated.  He well knew the only reason the investigator never participated in this proceeding is

Dellaportas, Parnes, and Sagi never called upon him to do so.  The investigator himself so testified.

224.     On March 24, 2022, an Israeli court issued a decision ("Israeli Court Decision"), and a final judgment after trial, ruling that the investigator's conduct in obtaining Orly's confidential personal travel information which he included in the Orly Report was illegal under Israeli statutes that make the conduct both civilly and criminally unlawful.

225.     The Israeli court found that the travel information concerning Orly that the investigator obtained "is confidential information *as a matter of law*"[45] and that the information could only have been obtained by Sagi's investigator "*unlawfully*" through violations of Israel's Privacy Protection Law and Computers Law, which are both civil and criminal in nature.[46]  The Israeli court also noted that "this is no generic infringement of Plaintiff's privacy, but rather an *illegal* infringement, which cannot be legalized by good faith, nor by presenting in court the results of the infringing acts, i.e., the presentation of the report produced by Respondent."[47]  The court made clear that the lack of an indictment was irrelevant to consideration of the criminal nature of the investigator's conduct.[48]

226.     The Israeli court's judgment that the investigator violated Israel's criminal laws by obtaining nonpublic government records concerning Orly was based on, among other things, the testimony of Mr. Ido Talmi, Head of Cyber and Information Security Division at the

---

[45] Israeli Court Decision at 10 (emphasis added).

[46] *Id.* at 13 (emphasis added).

[47] *Id.* at 19 (emphasis in original).  The Court did not find a violation regarding the specific banking information in the Orly Report because that information was 16 years outdated and incorrect.  Because she no longer had a bank account in Israel, her privacy was not violated.  *Id.* at 9.

[48] *Id.* at 19.

Population and Immigration Authority for the State of Israel, that a private investigator has no authorization to access and review details contained in the databases of the governmental Population Registry.[49]  The Israeli court concluded that:

> Therefore, prima facie, the detailed information in the possession of Respondent arose from him unlawfully reviewing and/or having had access to the database. Respondent had several opportunities during his cross examination to explain whether the information came to his possession other than through penetrating a confidential database. However, Respondent was very particular in refraining from providing any reason or explanation on how the information came to his possession – other than by penetrating a confidential database.[50]

227.     The Israeli court soundly rejected the investigator's frivolous defense concerning compliance with the Secret Subpoena, noting that "should we accept such an argument, then we will be forced to say that the statutory confidentiality stipulated by the Population Registry Law should be abolished in every instance whereby an opposing litigant desires to cross examine or even unlawfully infringe on the privacy."  The court also ruled that Sagi's investigator's testimony was persistently evasive and not credible, and that the investigator could not articulate how he could have obtained these records legally.[51]

228.     Sagi, Parnes, and Dellaportas, of course, were at the center of all of this misconduct and the frivolous defense rejected by the Israeli court.  Sagi hired the investigator to steal the information.  And Dellaportas and Parnes tried to furnish that investigator with the fake "defense" of being a witness in this U.S. proceeding by, among other things, issuing the Secret Subpoena prepared by Dellaportas in bad faith and abuse of process.  It is further evident that the

---

[49] *Id.* at 12.

[50] *Id.* at 13.

[51] *Id.* at 16, 13.

Secret Subpoena was issued for an improper purpose considering the hearing cited in that
subpoena took place in October 2019 in Texas (before venue was transferred to this Court), but
Sagi's investigator was not identified on Sagi's or any other party's original or updated witness
lists nor called as a witness at the hearing itself.[52]  Sagi also failed to provide notice to any party
that he had issued the subpoena.  Moreover, the Secret Subpoena was without any legal effect
since it was issued to a foreign national in Israel over whom a U.S. court had no jurisdiction.
Moreover, Parnes' further misconduct is demonstrated by his eventual admission that he
(according to him) permanently deleted the Herschmann Report – an act that reflects
consciousness of guilty and that insulated him from being compelled to provide it to anyone,
including the Israeli courts.

229.    It is therefore obvious that the Secret Subpoena was nothing more than a sham.  It
served no legitimate purpose to this or any other proceeding.  Sagi and Dellaportas have no
legitimate justification for abusing the subpoena power in this way, or for misleading the Court
and others on multiple occasions about the stolen records and the circumstances surrounding
them.

230.    Nor is this the first time these Defendants invaded Orly's privacy.  In 2018, they
stole Orly's travel records and alleged that Orly only "spent less than one month (just 27 days) in
Israel" during a specific six month period.  As the Israeli Court Decision found, the obtaining of
this type of information is "prima facie" illegal.  Neither Sagi, Parnes nor Dellaportas obtained
Orly's consent, a Court Order or issued a proper subpoena to obtain this information.

---

[52] *See* Docket Nos. 522, 525.

## CAUSES OF ACTION

### Count I

### Equitable Subordination – 11 U.S.C. § 510(c)

### (By Plaintiffs the Trustee, Orly Genger, Arie Genger and ADBG LLC against Defendants Sagi Genger, Dalia Genger, the Orly Trust, TPR Investment Associates, Inc. and D&K GP)

231.  Plaintiffs the Trustee, Orly, Arie and ADBG LLC repeat and reallege the foregoing paragraphs (with the exception of paragraphs under Section V.K, above) as if set forth fully herein.  Orly repeats and realleges all the foregoing paragraphs, including Section V.K, as if set forth fully herein.

232.  Arie Genger and ADBG LLC are creditors who have filed claims in this Chapter 7 Case.

233.  Sagi, Dalia, the Orly Trust, TPR, and D&K GP all submitted claims in Orly's bankruptcy proceeding.  Each of these claimants engaged in inequitable conduct directly related to their claims.

234.  These claimants' conduct harmed other creditors and gave the claimants an unfair advantage in the Chapter 7 Case.

235.  The subordination of claimants' claims is not inconsistent with and will not be contrary to the principles of bankruptcy law.

### Count II

### Breach of Fiduciary Duty
### (By Plaintiffs the Trustee and Orly Genger against Defendants Dalia Genger and Michael Oldner)

236.  Plaintiffs the Trustee and Orly repeat and reallege the foregoing paragraphs (except paragraphs in Section V.K) as if set forth fully herein.

237.   Dalia and Oldner, as purported trustees of the Orly Trust, owed fiduciary duties to the Orly Trust and its beneficiaries.  Orly is the primary beneficiary of the Orly Trust.

238.   Dalia and Oldner engaged in misconduct in taking actions purportedly on behalf of the Orly Trust, including granting the August 2019 Releases, entering into the Inter-Creditor Agreement, using Manhattan Safety and Recovery Effort to pursue claims on behalf of the Trust, and causing the Orly Trust, Manhattan Safety and Recovery Effort to incur large debts to intentionally deprive Orly of any Orly Trust proceeds.

239.   The Trustee and Orly suffered damages as a direct result of Dalia's and Oldner's misconduct.

240.   The aforementioned acts of Dalia and Oldner were willful and malicious.  The Trustee and Orly are therefore entitled to punitive damages.

## Count III

### Breach of Fiduciary Duty
### (By Plaintiffs the Trustee and Orly Genger against Defendant D&K GP)

241.   Plaintiffs the Trustee and Orly repeat and reallege the foregoing paragraphs (except paragraphs in Section V.K) as if set forth fully herein.

242.   As general partner of D&K, D&K GP owed fiduciary duties to D&K and the other partners of D&K, including the Orly Trust.

243.   D&K GP engaged in misconduct in taking actions contrary to the interests of D&K and D&K's other partners.

244.   The Trustee and Orly suffered damages as a direct result of D&K GP's misconduct.

245.   The aforementioned acts of D&K were willful and malicious.  The Trustee and Orly are therefore entitled to punitive damages.

## Count IV

### Aiding and Abetting Breaches of Fiduciary Duty
### (By Plaintiffs the Trustee and Orly Genger against all Defendants other than John Dellaportas and David Parnes)

246.   Plaintiffs the Trustee and Orly repeat and reallege the foregoing paragraphs (except paragraphs in Section V.K) as if set forth fully herein.

247.   As alleged herein, Dalia and Oldner breached their fiduciary duties to the Orly Trust and its beneficiaries, and D&K GP breached its fiduciary duty to D&K and D&K's other partners.

248.   Defendants knowingly induced and participated in Dalia's and Oldner's breaches, including by formulating the plan for and accepting the August 2019 Releases and arranging to impose purported material "debt" on the Orly Trust.

249.   Sagi knowingly induced and participated in D&K GP's breaches, including by directing D&K GP to take the actions that it did.

250.   The Trustee and Orly suffered damages as a result of the breaches of fiduciary duty in an amount to be determined at trial.

251.   The aforementioned acts of these Defendants were willful and malicious.  The Trustee and Orly are therefore entitled to punitive damages.

## Count V

### Breach of the Covenant of Good Faith and Fair Dealing
### (By Plaintiffs the Trustee and Orly Genger against Defendant Sagi Genger)

252.   Plaintiffs the Trustee and Orly repeat and reallege the foregoing paragraphs (except paragraphs in Section V.K) as if set forth fully herein.

253.   Sagi and Orly entered into the 2004 Indemnification Agreement, which the District Court found was a valid and binding contract.

254.   The 2004 Indemnification Agreement imposes upon Sagi a duty of good faith and fair dealing in its performance and its enforcement.

255.   Shortly before the bar date in the Chapter 7 Case, in or about December 2019, Sagi breached the implied covenant of good faith and fair dealing because his conduct, in particular in directing Dalia to make a demand under the 2004 Support Agreement solely to trigger Orly's obligations under the 2004 Indemnification Agreement even though Dalia had no need of the funds she demanded and no good faith basis to make such demand, frustrated the purpose of the 2004 Indemnification Agreement.

256.   The Trustee and Orly were damaged by Sagi's breach in an amount to be determined at trial.

### Count VI

### Abuse of Process
### (By all Plaintiffs against Defendants Dalia Genger, Sagi Genger, Michael Oldner, Robin Rodriguez, the Orly Trust, Manhattan Safety Maine, Inc. and Recovery Effort, Inc.)

257.   Plaintiffs repeat and reallege the foregoing paragraphs (except paragraphs in Section V.K) as if set forth fully herein.

258.   Defendants Dalia, Sagi, Oldner, Rodriguez, the Orly Trust, Manhattan Safety, and Recovery Effort commenced and/or continued proceedings in various courts preventing the maturity of the Settlement Notes.

259.   Dalia's December 2, 2019 demand that Sagi pay her $18.5 million under the 2004 Support Agreement was made in bad faith at Sagi's direction, as part of his scheme to extract payment from the Debtor and other Plaintiffs, and not because she has any need for such money. Dalia and Sagi then made various filings in the Chapter 7 Case asserting their entitlement to an additional $9.25 million from Orly as a result of Dalia's bogus demand.  Among others, these

filings included proofs of claim, and a complaint filed by Dalia seeking, among other things, the

imposition of a constructive trust with respect to the amounts she had demanded under the 2004

Support Agreement.

260.   These Defendants were motivated by ill-will, actual malice, and the desire to

injure Plaintiffs, as evidenced by, among other things, the submission of intentionally inflated

proofs of claim in the Chapter 7 Case, the filing of Dalia's constructive trust adversary

proceeding, sworn statements to the courts, their diametrically opposed positions concerning the

Orly Trust TRI Shares, their improper use of the provisions of the 2013 Settlement Agreement to

extend the maturity dates of the Settlement Notes and devalue the Settlement Notes through the

Indemnification Provision, their improper leveraging of the maturity dates and indemnification

provisions in the Surrogate's Court, their refusal to dismiss members of the Trump Group from

the Surrogate's Court action, their pattern of commencing and discontinuing actions, the timing

of the actions, and the circumstances surrounding the Inter-Creditor Agreement and the August

2019 Releases.

261.   By the foregoing, these Defendants sought collateral advantages or corresponding

detriments to Plaintiffs that were outside the legitimate ends of process.

262.   These Defendants' acts were a perversion of the purpose for which proceedings

may be instituted and constitute abuse of process.

263.   Plaintiffs were damaged as a result of these Defendants' improper abuse of

process.

264.   The aforementioned acts of these Defendants were willful and malicious.

Plaintiffs are therefore entitled to punitive damages.

**Count VII**

**Tortious Interference with Business Relations**
**(By Plaintiffs Orly Genger, Arie Genger and David Broser against all Defendants other**
**than Elana Genger, D&K GP, John Dellaportas and David Parnes)**

265.   Plaintiffs Orly, Arie and David Broser repeat and reallege the foregoing

paragraphs (except paragraphs in Section V.K) as if set forth fully herein.

266.   In 2013, Arie, Orly, David Broser and Arnold Broser (collectively, the "AG

Group"), on the one hand, and the Trump Group, on the other hand, entered into the 2013

Settlement Agreement under which the "AG Group" agreed to settle the disputes related to the

Arie TRI Shares and Orly Trust TRI Shares.   When the disputes were finally dismissed with

prejudice and the statute of limitations had run with respect to claims Sagi and other Defendants

could file, the two $7.5 million Settlement Notes would mature.

267.   Sagi, Dalia, and other Defendants knew of the 2013 Settlement Agreement and

the relationship between Arie and Orly and the Trump Group.

268.   Defendants Dalia, Sagi, Oldner, Rodriguez, the Orly Trust, Manhattan Safety, and

Recovery Effort commenced and/or continued proceedings in various courts solely to prevent

and which proceedings did prevent the maturity of the Settlement Notes.

269.   These Defendants were motivated by ill-will, actual malice, and the desire to

injure Plaintiffs, as evidenced by, among other things, sworn statements to the courts, their

diametrically opposed positions concerning the Orly Trust TRI Shares, their improper use of the

provisions of the 2013 Settlement Agreement to extend the maturity dates of the Settlement

Notes and devalue the Settlement Notes through the Indemnification Provision, their improper

leveraging of the maturity dates and indemnification provisions in the Surrogate's Court, their

refusal to dismiss members of the Trump Group from the Surrogate's Court action, their pattern

of commencing and discontinuing actions, the timing of the actions, and the circumstances surrounding the Inter-Creditor Agreement and the August 2019 Releases.

270.   In 2016, Dalia, as trustee of the Orly Trust, filed a baseless claim in the New York Surrogate's Court.  In 2018, at Sagi's direction, Dalia, as trustee of the Orly Trust, amended the Surrogate's Court petition, but did not dismiss the members of the Trump Group as defendants. In 2019, Dalia, as trustee of the Orly Trust, dismissed the Surrogate's Court claims against Arie and the Brosers, but did not dismiss the claims against Orly and the members of the Trump Group.  Since his purported appointment as successor trustee of the Orly Trust, Oldner has continued to maintain Surrogate's Court action against the Trump Group and Orly.  In refusing to dismiss the members of the Trump Group, Dalia, Oldner and the Orly Trust intended to prevent and have prevented the maturation of the Settlement Notes, and continued to devalue the Settlement Notes through application of the Indemnification Provision.

271.   Manhattan Safety and Recovery have since brought baseless lawsuits and claims against certain of the Plaintiffs and others to interfere with and try to obtain for themselves the benefits of the 2013 Settlement.

272.   These Defendants have acted in close coordination with each other and taken direction from Sagi and his counsel with respect to all material actions against Plaintiffs.

273.   As a result of Sagi's, Dalia's, and the other Defendants' conduct, Orly, Arie, and David Broser, as members of the "AG Group", have suffered damages.

274.   The aforementioned acts of Sagi, Dalia, and other Defendants were willful and malicious.  Orly, Arie, and David Broser are therefore entitled to punitive damages.

275.   Orly, Arie, and David Broser also are entitled to recover reasonable attorneys'
fees for prosecuting this action, as well as for the amount of all other fees and expenses
(including attorneys' fees) they have incurred defending against Defendants' baseless actions.

### Count VIII

### Tortious Interference with Contract
### (By Plaintiff ADBG LLC against all Defendants other than D&K GP, John Dellaportas and David Parnes)

276.   Plaintiffs repeat and reallege the foregoing paragraphs (except paragraphs in
Section V.K) as if set forth fully herein.

277.   In 2013, Arie, Orly, David Broser and Arnold Broser (collectively, the "AG
Group"), on the one hand, and the Trump Group, on the other hand, entered into the 2013
Settlement Agreement under which the "AG Group" agreed to settle the disputes related to the
Arie TRI Shares and Orly Trust TRI Shares.  When the disputes were finally dismissed with
prejudice and the statute of limitations had run with respect to claims Sagi and other Defendants
could file, the two $7.5 million Settlement Notes would mature.

278.   Sagi, Dalia, and other Defendants knew of the 2013 Settlement Agreement and
the relationship between Arie and Orly and the Trump Group.

279.   Defendants Dalia, Sagi, Oldner, the Orly Trust, Manhattan Safety, and Recovery
Effort commenced and/or continued proceedings in various courts with the intent to prevent and
which proceedings did prevent the maturity of the Settlement Notes.

280.   These Defendants were motivated by ill-will, actual malice, and the desire to
injure Plaintiffs, as evidenced by, among other things, sworn statements to the courts, their
diametrically opposed positions concerning the Orly Trust TRI Shares, their improper use of the
provisions of the 2013 Settlement Agreement to extend the maturity dates of the Settlement

Notes and devalue the Settlement Notes through the Indemnification Provision, their improper

leveraging of the maturity dates and indemnification provisions in the Surrogate's Court, their

refusal to dismiss members of the Trump Group from the Surrogate's Court action, their pattern

of commencing and discontinuing actions, the timing of the actions, and the circumstances

surrounding the Inter-Creditor Agreement and the August 2019 Releases.

281.   In 2016, Dalia, as trustee of the Orly Trust, filed a baseless claim in the New York

Surrogate's Court.   In 2018, at Sagi's direction, Dalia, as trustee of the Orly Trust, amended the

Surrogate's Court petition, but did not dismiss the members of the Trump Group as defendants.

In 2019, Dalia, as trustee of the Orly Trust, dismissed the Surrogate's Court claims against Arie

and the Brosers, but did not dismiss the claims against Orly and the members of the Trump

Group.   Since his purported appointment as successor trustee of the Orly Trust, Oldner has

continued to maintain Surrogate's Court action against the Trump Group and Orly.   In refusing

to dismiss the members of the Trump Group, Dalia, Oldner and the Orly Trust have prevented

the maturation of the Settlement Notes, and continued to devalue the Settlement Notes through

application of the Indemnification Provision.

282.   Manhattan Safety and Recovery have since brought baseless lawsuits and claims

against certain of the Plaintiffs and others to interfere with and try to obtain for themselves the

benefits of the 2013 Settlement.

283.   These Defendants have acted in close coordination with each other and taken

direction from Sagi and his counsel with respect to all material actions against Plaintiffs.

284.   These Defendants were motivated by ill-will, actual malice, and the desire to

injure Plaintiffs, as evidenced by, among other things, sworn statements to the courts, their

diametrically opposed positions concerning the Orly Trust TRI Shares, their improper use of the

provisions of the 2013 Settlement Agreement to extend the maturity dates of the Settlement

Notes and devalue the Settlement Notes through the Indemnification Provision, their improper

leveraging of the maturity dates and indemnification provisions in the Surrogate's Court, their

refusal to dismiss members of the Trump Group from the Surrogate's Court action, their pattern

of commencing and discontinuing actions, the timing of the actions, and the circumstances

surrounding the Inter-Creditor Agreement and the August 2019 Releases.

285.   The Credit Agreement, as amended, was a valid contract between ADBG and

Arie.

286.   Defendants had knowledge of the Credit Agreement.

287.   Defendants intentionally procured Arie's breach of the Credit Agreement without

justification.

288.   Arie did, in fact, breach the Credit Agreement by failing to repay amounts due

thereunder by the maturity date.

289.   ADBG has been damaged by Arie's breach in an amount not less than $4 million,

plus the amount of all fees and expenses (including attorneys' fees) it has incurred enforcing its

obligations and defending against Defendants' baseless actions.

290.   The aforementioned acts of Sagi, Dalia, and other Defendants were willful and

malicious.  ADBG is therefore entitled to punitive damages.

### Count IX

### Conversion
### (By Plaintiff Orly Genger against Defendants Sagi Genger,
### John Dellaportas and David Parnes)

291.   Orly repeats and realleges the foregoing paragraphs as if set forth fully herein.

292.   Defendants Sagi, Dellaportas and Parnes intentionally obtained Orly's confidential personal information without her consent and in violation of Israeli law.  Such information includes but is not limited to Orly's confidential personal Israeli travel records (entries and exits from Israel) and bank account information.

293.   Orly has an exclusive possessory right and interest and a privacy interest in the confidential personal information that these Defendants wrongfully obtained.

294.   These Defendants exercised dominion over this confidential personal information of Orly and interfered with such information in derogation of Orly's exclusive rights.

295.   Orly was damaged as a result of these Defendants' actions.

296.   The aforementioned acts of Sagi, Dellaportas and Parnes were willful and malicious.  Orly is therefore entitled to punitive damages.

## Count X

### Abuse of Process
### (By Plaintiff Orly Genger against Defendants Sagi Genger, John Dellaportas and David Parnes)

297.   Orly repeats and realleges the foregoing paragraphs as if set forth fully herein.

298.   Defendants Sagi, Dellaportas and Parnes conspired to cause the Secret Subpoena to be issued and concealed their true motive for issuing it.

299.   These Defendants did not issue that subpoena for any legitimate purpose.  Instead, they arranged for the subpoena solely to be used as part of a ruse to mislead the court in Israel to accept the so-called good faith "defense" of Sagi's Israeli investigator when he in fact had no good faith purpose in illegally obtaining Orly's private information protected by Israeli law.

300.   These Defendants were motivated by ill-will, actual malice, and the desire to injure Orly, as evidenced by, among other things, Sagi's/Dellaportas' false statements to the courts that Orly maintained an Israeli bank account when they knew such statement are false.

301.   By the foregoing, these Defendants sought collateral advantages or corresponding detriments to Orly that were outside the legitimate ends of process.

302.   These Defendants' acts were a perversion of the purpose for which a federal subpoena may be issued and constitute abuse of process.

303.   Orly was damaged as a result of these Defendants' improper abuse of process.

304.   The aforementioned acts of Sagi, Dellaportas and Parnes were willful and malicious.  Orly is therefore entitled to punitive damages.

**Count XI**

**Invasion of Privacy/ Intrusion Upon Seclusion**
**(By Plaintiff Orly Genger against Defendants Sagi Genger,**
**John Dellaportas and David Parnes)**

305.   Orly repeats and realleges paragraphs the foregoing paragraphs as if set forth fully herein.

306.   Defendants Sagi Genger, John Dellaportas, and David Parnes intentionally intruded on Orly's private affairs when they unlawfully stole her private personal information and used it to make false allegations against her.

307.   Orly had a reasonable expectation of privacy in the confidential information that Defendants intentionally stole.

308.   These Defendants' intentional actions in invading Orly's privacy were highly offensive and objectionable. Defendants knew that ordinary persons in Orly's position would

consider the unlawful taking of her private information to be an invasion of privacy and to be highly offensive and objectionable.

309.    In invading her privacy, these Defendants acted with intentional malice and oppression and in conscious disregard of Orly's right to have such information kept confidential and private.

310.    Orly has suffered damages as a direct and proximate consequence of the invasion of her privacy by intrusion, including mental anguish and suffering, and therefore seeks an award of damages including punitive and exemplary damages.

**Count XII**

**Invasion of Privacy/ Public Disclosure of Private Facts
(By Plaintiff Orly Genger against Defendants Sagi Genger,
John Dellaportas and David Parnes)**

311.    Orly repeats and realleges the foregoing paragraphs as if set forth fully herein.

312.    Defendants Sagi Genger, John Dellaportas, and David Parnes intentionally intruded on Orly's private affairs when they unlawfully stole her private personal information and publicized it in court filings in order to make false allegations against her.

313.    The private information that Defendants stole and publicized was of no legitimate public concern.

314.    Defendants' intentional actions in invading Orly's privacy and publicizing her private information were highly offensive and objectionable. Defendants knew that ordinary persons in Orly's position would consider the publication of her private information to be an invasion of privacy and to be highly offensive and objectionable.

315.   In intentionally misusing and/or disclosing her private information, Defendants acted with intentional malice and oppression and in conscious disregard of Orly's right to have such information kept confidential and private.

316.   Orly has suffered damages as a direct and proximate consequence of the invasion of her privacy by public disclosure of her private information, including mental anguish and suffering, and therefore seeks an award of damages including punitive and exemplary damages.

**Count XIII**

**Civil Conspiracy**
**(By Plaintiff Orly Genger against Defendants Sagi Genger,**
**John Dellaportas and David Parnes)**

317.   Orly repeats and realleges the foregoing paragraphs as if set forth fully herein.

318.   The acts of the Defendants, as set forth above, constitute a civil conspiracy as defined in the law of Texas, to wit: "A civil conspiracy consists of a combination by two or more persons to accomplish an unlawful purpose or a lawful purpose by unlawful means." Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 614 (Tex. 1996). Defendants conspired to steal Orly's private information unlawfully and then cover up their illegal acts.

319.   Defendants committed a number of overt acts in furtherance of the conspiracy, including wire fraud, mail fraud, conversion, and invasion of privacy.

320.   Defendants acted with intent to harm Orly, and the wrongful acts underlying the unlawful civil conspiracy proximately caused damages to Orly.

**Count XIV**

**Violation of NY Judiciary Law § 487**
**(By Plaintiff Orly Genger against Defendant**
**John Dellaportas)**

321.   Orly repeats and realleges the foregoing paragraphs as if set forth fully herein.

322.    As enumerated in the above, Defendant John Dellaportas is guilty of deceit and/or collusion with intent to deceive the court or any party.  Not only has he engaged in an extensive abuse of process by issuing a Secret Subpoena to help steal private information, he has repeatedly made multiple perjurious misrepresentations to the court in order to try and cover up his own malfeasance.

323.    Orly is entitled to and seeks actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, as applicable, request that this Court enter judgment in their favor against Defendants, as applicable, as follows:

1.    For Count I, pursuant to 11 U.S.C. §510(c), equitably subordinating the claims submitted in the Chapter 7 Case by Defendants to all other claims asserted against Orly in the Chapter 7 Case;

2.    For Counts II through VIII, awarding a judgment against the Defendants in the amount of the damages sustained by the appropriate Plaintiffs identified herein, as a result of the Defendants' wrongful acts, plus pre-judgment interest, fees, costs and expenses;

3.    For Counts II through IV and VI through X, awarding punitive damages;

4.    For Counts XI through XIII, awarding a judgment against Defendants Sagi Genger, David Parnes, and John Dellaportas in the amount of the damages sustained by Plaintiff Orly Genger as a result of Defendants' wrongful acts, plus punitive and exemplary damages, pre-judgment interest, attorneys' fees, and costs.

5.    For Count XIV, awarding a judgment against Defendant John Dellaportas in the amount of the three times the amount of damages sustained by Plaintiff Orly Genger as a result of the misconduct of Defendant John Dellaportas, plus pre-judgment interest, attorneys' fees and costs;

6.    awarding Plaintiffs the costs of this action; and

7.    granting Plaintiffs all other and further relief that is just and proper.

Dated:  New York, New York
        June 10, 2022

**GLENN AGRE BERGMAN &
FUENTES LLP**

*/s/ Michael Paul Bowen*
Michael Paul Bowen
55 Hudson Yards, 20th Floor
New York, New York 10001
(212) 358-5600
Email: mbowen@glennagre.com

*Attorneys for Orly Genger*

**TARTER KRINSKY & DROGIN LLP**

*/s/ Rocco A. Cavaliere*
Rocco A. Cavaliere
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Email:  rcavaliere@tarterkrinsky.com

*Attorneys for Deborah J. Piazza,
Chapter 7 Trustee*

**TOGUT, SEGAL & SEGAL LLP**

*/s/ Frank A. Oswald*
Frank A. Oswald
Jared Borriello
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 201-5590
Email: frankoswald@teamtogut.com
        jborriello@teamtogut.com

*Attorneys for Arie Genger*

**HUGHES HUBBARD & REED LLP**

*/s/ Christopher Gartman*
Christopher K. Kiplok
Christopher Gartman
Carl Mills
One Battery Park Plaza
New York, New York 10004
(212) 837-6000
Email: chris.kiplok@hugheshubbard.com
        chris.gartman@hugheshubbard.com
        carl.mills@hugheshubbard.com

*Attorneys for ADBG LLC and David Broser*