**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Deborah J. Piazza, as Chapter 7 Trustee of the Orly Genger Estate, Orly Genger, Arie Genger, David Broser, and ADBG LLC,<br><br>Plaintiffs and Counterclaim Defendant,<br><br>v.<br><br>Dalia Genger, Sagi Genger, Michael Oldner, Elana Genger, Manhattan Safety Maine, Inc., Recovery Effort, Inc., Robin Rodriguez, D&K GP LLC, TPR Investment Associates, Inc., The Orly Genger 1993 Trust, Created by Trust Agreement Dated December 13, 1993 between Arie Genger, as Grantor, and Lawrence M. Small and Sash A. Spencer, as Trustees, John Dellaportas, David Parnes, and John and Jane Does 1 through 10,<br><br>Defendants, | **Chapter 7**<br>**Main Case No. 19-13895 (JLG)**<br>**Adv. Proc. 22-01106-jlg**<br><br>**ANSWER, COUNTERCLAIMS, AND THIRD-PARTY CLAIMS OF JOHN DELLAPORTAS** |
| John Dellaportas,<br><br>Counterclaimant and Third-Party Plaintiff,<br><br>v.<br><br>Michael Paul Bowen and John Does 1-10,<br><br>Third-Party Defendants, | |

**ANSWER**

John Dellaportas ("Dellaportas"), *pro se* defendant, by and for his Answer to the claims asserted against him by plaintiff Orly Genger ("Orly"), hereby states as follows:

1. Dellaportas denies Paragraphs 1-8, 10-11, 14, 20-27, 30 (last sentence only), 32, 37, 70, 72, 80, 87-88, 90, 94, 103-105, 108-109, 112, 114-124, 129, 132-143, 145, 148, 150-153, 155-156, 158-161, 164, 166-167, 171, 174-182, 184, 186, 188, 197-200, 202-204, 208-216, 219-224, 226, 228-230, and 291-323.

2. Dellaportas denies direct knowledge and information as to Paragraphs 15-19, 28-29, 31, 33-36, 38-69, 71, 73-79, 83-85, 92, 96-101, 106, 113, 146, 154, 157, 163, 165, 168-170, 192, and 217-218, and on that basis, denies the allegations.

3. Dellaportas admits Paragraphs 30 (except for last sentence), 149, 190-191, and 205-207.

4. Dellaportas avers that Paragraphs 81-82, 86, 89, 91, 93, 95, 102, 107, 110-111, 125-128, 130-131, 144, 147, 162, 172-173, 183, 185, 187, 189, 193-196, 225, and 227 purport to characterize various Court rulings, documents and/or testimony. For each such Paragraph, Dellaportas respectfully directs the Court to the actual ruling, document or testimony to which such Paragraph refers for the complete and correct contents thereof. To the extent any further response is required from Dellaportas, the allegations therein are denied.

5. Paragraphs 231-290 are claims not directed to Dellaportas. To the extent any response is required from Dellaportas, the allegations therein are denied.

6. Paragraphs 9, 12-13 and 201 are contentions of law by Plaintiffs to which no response is required from Dellaportas. To the extent any response is required from Dellaportas, the allegations therein are denied.

## AFFIRMATIVE DEFENSES

1. Orly's claims are barred the numerous acts of fraud on the court, perjury, perfidy, false testimony, unclean hands and other wrongful acts committed by Orly, her counsel, and others in privity with her (in each case, with her knowledge and approval).

2. Orly's claims are barred by litigation privilege.

3. Orly's claims are barred by attorney immunity.

4. Orly's claims are barred by res judicata.

5. Orly's claims are barred by collateral estoppel.

6. Orly's claims are barred by judicial estoppel.

7. Orly's claims are barred by equitable estoppel.

8. Orly's claims are barred by her failure to list them on her bankruptcy schedules.

9. Orly's claims are time-barred.

10. Orly's claims are barred by her lack of injury

11. Orly's claims are barred by her lack of standing and capacity.

12. Orly's claims are barred for lack of subject matter jurisdiction.

13. Orly's claims are barred by the satisfaction of the prior judgment in her favor.

14. Orly's claims are barred by the automatic stay, 11 U.S. C. § 362.

15. Orly's claims are barred by public policy.

16. Orly's claims fail to state a claim upon which relief may be granted.

## COUNTERCLAIMS AND THIRD-PARTY CLAIMS

John Dellaportas, *pro se* counterclaimant and third-party plaintiff, for his claims against counterclaim defendant Orly Genger ("Orly") and third-party defendants Michael Paul Bowen ("Bowen"), and John Does 1-10 (together, "Defendants"), hereby alleges as follows.

1. This is an action for attorney deceit under NY Judicial Law §487, libel, and tortious interference with business relations, in connection with sham claims (the "Sham Claims") brought against Dellaportas in this proceeding, which Sham Claims are premised on a series of false statements, each of which Defendant knows to be false, with the untoward goals of deceiving the Court, maliciously defaming Dellaportas, and harassing, bullying and disrupting Dellaportas' more-than-decade-long business relationship with TPR Investment Associates, Inc., Sagi Genger and affiliated parties (the "TPR Client Parties").

2. The Sham Claims follow a long series of sham and frivolous claims brought by Orly against the TPR Client Parties in various courts over the past decade, which Dellaportas, representing the TPR Client Parties, has successfully defeated. Unable to defeat Dellaportas in other court, Defendants have resorted to an abject fraud on this Court, which has caused and will continue to cause him injury in the amount of no less than $20 million.

## JURISDICTION

3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and the U.S. District Court for the Southern District of New York's Amended Standing Order of Reference, M-431 dated January 31, 2012, which refers such proceedings to this Court. To the extent such consent is required, Dellaportas consents to entry of a final order or judgment in this action by this Court.

4. Venue is proper pursuant to 28 U.S.C. § 1409.

## PARTIES

5. Dellaportas is a natural person domiciled in New York.

6. Orly is a natural person who has claimed at various points to be domiciled in various places, most recently Texas.

7. Bowen is a natural person who, upon information and belief, is domiciled in New York.

8. John Does 1-10 are persons whose identities are currently unknown.

## BACKGROUND

9. Orly is a serial prevaricator. As multiple courts have found, she has lied under oath to further her litigation vendetta against her mother Dalia Genger and brother Sagi Genger. In this regard, she has been facilitated by several of her lawyers, in clear contravention of their duties under the Rules of Professional Conduct. Orly has undertaken these false statements in furtherance of her father's longstanding scheme to deny his former wife any share of the family's wealth after Sagi exposed his father's fraud upon his mother.

### Court Decisions Calling Out Orly For False Testimony

10. In fifteen years, Orly has brought at least ten suits against her mother and brother. They have not gone well for her; to date, each one has been unsuccessful. And in the process, *no less than five different judges have remarked on her untruthfulness*.

11. In 2008, Surrogate Roth of the New York State Surrogate's Court threw out Orly's first of many lawsuits against Dalia in that court, seeking to remove her as trustee of her trust, on the ground that Orly's petition was based on a "material misstatement." *In re Genger*, 2008 WL 11188493, *3 (Surr. Ct., N.Y. Cnty. Dec. 31, 2008).

12. In 2010, then-Chancellor Strine of the Delaware Chancery Court (later elevated to Chief Justice of the Delaware Supreme Court), following a lengthy trial, held that Orly had fabricated a supposedly exculpatory conversation involving her father, and further that she had done so in order to harm her brother Sagi. *See TR Investors, LLC v. Genger*, 2010 Del. Ch. LEXIS 153, *19 (Del. Ch., July 23, 2010) ("The lack of specific details in [Orly's] testimony

undermines her credibility because of her personal interest in the outcome of this case and her obvious desire to protect her father in his feud with her brother."), *aff'd in relevant part*, *Genger v. TR Investors, LLC*, 26 A.3d 180, 2011 Del. Lexis 371 (Del. 2011).

13. In 2015, U.S. District Judge Forrest found that Orly had been woefully untruthful when she claimed that that: "Sagi (via TPR) obtain[ed] all the value [from the family's shares in Trans-Resources, Inc.] – and Orly none." "As it turns out," Judge Forrest observed, "Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million." *Genger v. Genger*, 76 F. Supp. 3d 488, 501 (S.D.N.Y.), *aff'd*, 663 F. App'x 44 (2d Cir. 2016). Each of the foregoing were dispositive rulings.

14. The pattern continued in this bankruptcy case. Orly first commenced this case in the Western District of Texas, claiming Texas domicile despite having previously claimed in sworn statements to be a full-time Israeli resident. In a parallel proceeding, her husband made similar inconsistent statements, also under oath.

15. The courts in Texas took notice.

16. First, in 2019, Magistrate Judge Austin held that Orly and her husband, "as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in whichever location most suits their legal needs at the time … in an attempt to frustrate the post- judgment discovery being attempted by Sagi Genger". *Genger v. Genger*, 2019 WL 12420871, *3 (W.D. Tx. Apr. 15, 2019).

17. Later that same year, Bankruptcy Judge Davis, in transferring this case from Texas to this District, held that: "Judge Austin's … finding, after looking at many of the same Declarations I have looked at, is germane. As Judge Austin observed this Debtor can and will claim residence in a location that suits her legally strategic interests."

**Orly's Perjury, Suborned By Bowen, In This Case**

18. One might have hoped that these repeated chastisements from various judges would have encouraged Orly to be truthful. But that has not been the case.

19. From the outset, the central question in this bankruptcy case has been why Orly had filed for bankruptcy at all, given that (as District Judge Forrest found) she had settled her prior suit for $32.3 million, $15 million in the form of two $7.5 million promissory notes *which had yet to be paid*. Bankruptcy Judge Davis sent Orly to this District with an express directive that she "explain what happened to 32 million dollars". Throughout the case and at trial, Orly's explanation (which stretches all credulity) was that not a single penny of that money, including the $15 million in notes, belonged to her. Her testimony in this regard was drawn out by her attorney, Bowen, who not coincidentally is the holder of the two notes:

**Bowen: Do you know how much went to your father versus how much went to the Browser --**

**Orly. No, I don't.**

**Bowen:. -- and what dates?**

**Orly. I don't.**

**Bowen: Did you look into it?**

**Orly. No, I did not.**

**Bowen: Did you have any interest in looking into it?**

**Orly. Not particularly.**

**Bowen: Well, why not?**

**Orly. Because it didn't concern me.**

**Bowen: Because none of the money belongs to you?**

**Orly: Yeah, it has nothing to do with me, the money.**

**Bowen: … [H]ave you taken it upon yourself or asked anybody on your behalf to monitor any payout of the two 7.5-million-dollar notes to be sure the amounts and the dates any payout pursuant to those notes?**

**Orly: No.**

**Bowen:** **Why not?**

**Orly:** **That's not my job. It doesn't concern me. It's – why would I? …**

**Bowen:** **Are you making a claim -- well, let me put it this way. To your understanding, do you have a claim to any portion of the offset fifteen million dollars?**

**Orly:** **No.**

20. Needless to say, all of this testimony was false, and indeed both Orly and Bowen knew it to be false when Bowen elicited that testimony from Orly. In his Post-Trial Brief in Further Support of his Motion to Dismiss (Doc 510, Filed 07/30/21), Sagi set forth multiple contemporaneous records, each with Orly's signature, establishing her continued entitlement to a majority of the $32.3 million settlement proceeds. Most or all of these records were in Bowen's possession *before* the he suborned the above, perjurious testimony.

21. Indeed, many of these documents were in Bowen's possession before he himself made similar, false claims to other courts. For example, in a 2019 brief Bowen signed and filed with the U.S. Court of Appeals for the Second Circuit on behalf of Orly, he falsely claimed that: "The remaining balance of $15 million … has nothing to do with Orly." Bowen knew this to be false when he made this false representation to the Court of Appeals.

22. Yet it was only in this Adversary Proceeding Complaint—signed by Bowen on behalf of Orly—that, after three years of non-stop lies, the two finally admitted the truth. Contrary to their prior representations, Count VII of their Adversary Proceeding Complaint now asserts that Orly has been damaged by actions that allegedly prevented the two $7.5 million notes from maturing. By necessity, Orly cannot have been harmed by the failure of a third party to pay on notes to which she disclaims any benefit, unless Orly actually does have such a benefit. Yet rather than apologize to the Court for their mendacity, Defendants have doubled down with a slew of new false statements, this time directed in part at Dellaportas as counsel.

**Dellaportas' 12-Year Long Successful**
**Representation of TPR Client Parties**

23. In 2010, the TPR Client Parties retained Dellaportas (then with another firm) to represent them in the first of what became over a dozen Genger-family litigations. In the ensuing twelve years, Dellaportas on behalf of the TPR Client Parties has ultimately prevailed on each of those suits that have reached a conclusion. Yet rather than draw the obvious inference that the court system does not appreciate their endless, frivolous suits, Orly and her lawyers have come to the opposite conclusion; namely, that it is Dellaportas who is responsible for this string of legal victories, and that a disruption of his attorney-client relationship with the TPR Client Parties will finally turn their luck around. Their Adversary Proceeding Complaint is a bald-faced effort to relitigate their prior legal defeats to Dellaportas.

24. There are too many Genger family suits to list in this pleading, but here are some of the key legal victories Dellaportas procured for the TPR Client Parties:

- In 2008, Orly filed suit against Sagi claiming that he had defrauded her out of CAD 12 million when he bought out her interest in a Canadian real estate venture. After eleven years of litigation, in 2019, the Court-appointed Mazars accounting firm issued a 145-page report, in which it concluded that, after application of a DLOM, Sagi had actually *overpaid* Orly for her share. In the ensuing three years, neither Orly nor the Chapter 7 Trustee has taken any further steps to prosecute the action.

- In 2009, Orly filed suit against the TPR Client Parties claiming they had defrauded a trust to which she was beneficiary of $85 million via an auction of shares in which her trust held a minority interest. Following a two-week trial, JHO Gammerman ruled that the TPR Client Parties had in reality sold the shares for the correct price. The New York Supreme Court went on to enter judgment in their favor on all counts.

- In 2010, Orly (together with her father) filed suit against the TPR Client Parties claiming they had been injured by $250-$350 million in connection with Sagi's trust's sale of its own shares to third parties. In a unanimous decision, the Appellate Division dismissed all the claims against the TPR Client Parties based on unclean hands and other grounds.

- In 2013, TPR brought an action in the U.S. District Court seeking a permanent injunction releasing $10.3 million in escrowed sale proceeds belonging to TPR. Orly opposed, claiming that the $10.3 million actually belonged to her. U.S. District Judge Keenan disagreed, and granted TPR the requested permanent injunction.

- Later in 2013, Orly brought suit against TPR and the escrow agent of the aforementioned escrow, seeking to relitigate the U.S. District Court's finding in New York Supreme Court. The Court declined to do so, and threw out the suit on a motion to dismiss.

- In 2014, Sagi brought a breach of contract suit against Orly after she reneged on the parties' shared financial obligation to support their mother. In 2015, U.S. District Judge Forrest granted summary judgment to Sagi, and in 2016, the Second Circuit unanimously affirmed.

- In 2017, Sagi brought a third-party breach of contract action against Orly after she again reneged on their shared financial obligation to their mother, and sought to repudiate the prior District Court ruling. In 2018, U.S. District Judge Forrest again granted summary judgment to Sagi, and in 2019, the Second Circuit again unanimously affirmed.

In each of the above, Dellaportas was lead counsel to the TPR Client Parties.

25. In reviewing this record and granting the TPR Client Parties' motion to transfer this case (another evidentiary hearing on which Dellaportas prevailed for the TPR Client Parties), Bankruptcy Judge Davis concluded that: "**[Orly] had, months before [allegedly moving to Texas], retained Texas bankruptcy counsel and had already suffered many adverse decisions from New York Courts. The inference is clear that the move to Texas in February of 2019 was at least, in part, prompted by a desire to file bankruptcy in Texas should it become necessary to get away from the New York Courts.**"

**Defendants' Efforts To Interfere With Dellaportas' 12-Year Successful Representation of TPR Client Parties**

26. Never one to focus on the actual merits, Orly and her counsel have, from the outset, tried to bully, harass and intimidate Dellaportas out of his representation of the TPR Client Parties. Their current, fraudulent pleading is the latest in years of such tactics.

27. In 2011, one of Orly's lawyers (who claimed to be good friends with the then-Manhattan District Attorney) sent Dellaportas a vaguely threatening email, warning him that: "Good luck as this 'stupid' lawyer is now highly motivated, beyond that which I suspect you are accustomed to dealing with as you don't do white collar work."

28. In 2013, another of Orly's lawyers invited Dellaportas to his office for what was billed as a settlement discussion. Instead, the lawyer showed Dellaportas the cover page of a complaint, the caption of which listed Dellaportas as one of the defendants. Sagi did not accede to Orly's demand, after which the complaint was never filed.

29. In 2014, Orly's lawyer sought to disqualify Dellaportas as trial counsel from the first of the two cases before District Judge Forrest. Simultaneous with granting summary judgment to Sagi, Judge Forrest denied Orly's disqualification motion.

30. In 2015, a new legal team stepped in for Orly, led by an attorney who would later become her husband ("Orly's Husband-Lawyer") and his law partner, Bowen. The two immediately began a new stream of threats against Dellaportas personally, both verbal and in writing. In a string of emails, Orly's Husband-Lawyer accused Dellaportas of unspecified "theft" and repeatedly threatened unspecified criminal prosecution, based on his and Bowen's claimed prior employment as state prosecutors: "Mike [Bowen] and I have reviewed our extensive criminal prosecutorial background to see if we have seen anything like this, and clearly we have not." In his opening in the 2016 trial he lost before JHO Gammerman, Orly's Husband-Lawyer went so far as to accuse Dellaportas of money laundering, for legal fee payments he characterized to the Court as "quote unquote legal fees."[1]

31. Taking his queues from his senior partner, Orly's Husband-Lawyer, defendant

[1] Later, Dellaportas came to see Orly's Husband-Lawyer make similar threats to other lawyers. Apparently, this is his way of litigating, notwithstanding Rule 3.4(e).

Bowen eagerly joined in these threats, some with an even more menacing tone. In May 2015, for example, Dellaportas witnessed Bowen engage in threats of physical violence against a visiting attorney from Israel, who later documented the incident in writing.

32. The attempted bullying, harassment and intimidation of Dellaportas only escalated as Dellaportas wracked up further interim legal victories in the case (winning the transfer motion following an evidentiary hearing, then successfully prevailing on two significant discovery disputes meriting lengthy Court rulings).

33. At one point, Orly's Husband-Lawyer tried to smear Dellaportas in the eyes of this Court by fabricating a claim Dellaportas leaked a story about him to the *Politico* web site. Dellaportas, of course, had done no such thing. To bolster his delusional claim, Orly's Husband-Lawyer further fabricated that the "White House" had discovered the leaker, and that the reporter had admitted it to him directly. Orly's Husband-Lawyer even went so far as to suggest that the leak was somehow jeopardizing the Middle East peace process (in which Orly's Husband-Lawyer supposedly played some minor role). Later, the *New York Times* reported that Orly's Husband-Lawyer himself was an accomplished media leaker, having engaged in a scheme to try to plant dirt on a political opponent with the *Wall Street Journal*.

**<u>Defendants' Witness Intimidation</u>**

34. All of these intimidation efforts failed. So, as one last gambit, Defendants have now brought the instant suit, which arises out of several perjurious declarations sworn to by Orly and submitted by Bowen and her other lawyers. In certain of those sworn statements, Orly claimed to be living full-time in Israel, even though her credit card and other records clearly reflected her spending most of her time in New Jersey (a short commute from her Husband-Lawyer's then-law office in Midtown Manhattan). In filing in Texas, where she did not reside,

and in opposing Sagi's motion to transfer venue to this District, this Court found that Orly squarely put her travel and whereabouts at issue.

35. Sagi, through his Israeli counsel (not Dellaportas) retained a licensed private investigator in Israel to investigate the matter. The investigator procured a report about Orly's travel and banking, which Sagi provided directly to his then-Texas counsel, Sabrina Streusand, who in turn immediately provided a copy to the Chapter 7 trustee (who then provided a copy to Orly and Orly's Husband-Lawyer). Orly responding by flying her Husband-Lawyer to Israel where, together with two of Orly's Israeli lawyers, he interrogated the investigator (outside the presence of the investigator's counsel) and threatened him with criminal prosecution in Israel and the United States. The meeting was recorded and transcribed. In it, Orly's Husband-Lawyer threatened the investigator not only based on his claimed prior employment as a prosecutor, but also based on his claimed relationship to the U.S. Ambassador:

> **"For background, so you know, I was a prosecutor in the US …<u>So I know what this means both legally and illegally in Israel as well as in the US …</u>**
>
> **<u>…. I'm certain that if you did some research you'd figure out I can afford to sew [sic] and be in court and if you did some level of research, then you'd know of my relations to the US ambassador here."</u>**

36. Here is how the investigator later described the meeting to the Israeli court:

> "On September 20, 2019, Adv. Yuval Nachmani contacted me by telephone and asked that I attend a meeting with the Plaintiff at his office. Adv. Nachmani said that the Plaintiff has widespread connections in Israel and overseas, and that if I chose not to be present at the meeting, it would be to my detriment.
>
> **On September 23, 2019, there was a meeting at Adv. Yuval Nachmani's office, with the Plaintiff and Adv. Dror Arad Ayalon, Adv. Nachmani's partner. The three told me that the investigation I conducted about Orly was filed with the U.S. courts and the information in the investigation report implicated me criminally and civilly, in Israel and overseas. …**
>
> The three were well aware that I was married, a father of four minors who were my dependents, 'without the penny in my pocket' [to spare], and that my entire income was from my occupation as a private investigator.

> **The three succeeded in pressuring and scaring me, that I was about to lose my entire world if I did not cooperate with them and provide them what they were requesting. …**
>
> The meeting ended after I consulted with an attorney who I know, with whom I spoke during one of the breaks that I requested during the meeting. The attorney explained to me that the actions and omissions of the Plaintiff and his two attorneys are extortions with threats, and it would be best that I end the meeting with the three, which stunk to high-heaven.
>
> **After the meeting ended, the Plaintiff and his attorneys turned my life upside down. The Plaintiff and the attorneys sent private investigators to follow me. … If that were not sufficient, the Plaintiff and his attorneys sent private investigators to follow my wife and minor children….**
>
> **Following faulty pressure exerted on me by the investigator, I was hospitalized for six days in the hospital due to a panic attack. Notwithstanding the foregoing, I cooperated with the Israeli Police, … which ultimately led to closing the file against me**."

37. These threats were specious; the Israeli National Police later found no crime had been committed. However, their witness intimidation succeeded. The private investigator, even when subpoenaed, declined to testify at Orly's venue hearing.

**Defendants' Sham Claims Against Dellaportas**

38. As the Court's decision on Sagi's motion to dismiss looms, Defendants have undertaken a final, desperate tactic—an adversary proceeding to undo a decade's worth of prior litigation defeats through one, massive relitigation in this Court.

39. The claims against Dellaportas' clients, like the claims against Dellaportas himself, are frivolous on their face. To cite just one example, the adversary proceeding plaintiffs in Cout VI assert a cause of action against the TPR Client Parties and others for, in their words, having "commenced and/or continued proceedings in various courts preventing the maturity of the Settlement Notes." As even cursory legal research would reveal, the commencement and prosecution of a civil proceeding alone never forms the basis for an abuse of process under New York law. *See, e.g., Marks v. Marks*, 113 A.D.2d 744, 745 (2d Dept. 1985).

40. Clearly, Defendants brought the Sham Claims for other, illicit reasons. Indeed, they all but admit as much in paragraph 9 of their Adversary Proceeding Complaint, entitled "STAY PENDING DISPOSITION OF PENDING MOTIONS." In it, they ask that their own action be stayed. This request is not merely made in passing. When counsel for certain of the adversary proceeding defendants asked for a short extension, counsel for the adversary proceeding plaintiffs refused unless they would agree to a full stay of the case.

41. In sum, the Sham Claims are so frivolous and false that Defendants and their cohorts plainly never intend to prosecute them. Instead, their true purpose is threefold: first, to deceive the Court; second, to maliciously defame Dellaportas; and third, to harass, bully and disrupt Dellaportas' more-than-decade-long business relationship with his clients, the TPR Client Parties, by manufacturing an artificial conflict of interest with them. Whatever the pretext, the Sham Claims contain allegations that Defendants know to be false, which is almost certainly why their own co-plaintiffs have pointedly refused to sign on to them.

**Defendants' Malicious, Libelous and False**
**Allegations Against Dellaportas**

42. While a full accounting of all of Defendants' false claims must await a trial, for purposes of the instant pleading, Dellaportas notes the following:

> ***Libelous Allegation #1****: "To further their unlawful scheme against Orly, Sagi, together with and through his longstanding attorneys Parnes and Dellaportas, illegally and surreptitiously obtained Orly's personal and confidential Israeli travel and banking records …."*
>
> **The Truth**: As Defendants know, (a) Dellaportas did not hire the investigator, (b) the Israeli National Police determined no laws were broken, and (c) this Court has determined that the underlying investigative work was directly relevant to key venue issues Orly put at issue (through affidavits held to be false).
>
> ***Libelous Allegation #2****: "Meanwhile, Sagi's American counsel … falsely represented to this Court that "this type of information on account holders is commonly available" in Israel.*

> **Truth**: Dellaportas was speaking of banking information. As Defendants know, the Israeli court validated Dellaportas' position, rejecting Orly's claim as to her banking information and ruling that: "The information in the first [part of the report] – the name of the bank in which Plaintiff supposedly maintained her account as well as the branch number, do not constitute a civil wrong."
>
> ***Libelous Allegation #3****: "Dellaportas went to great lengths to cover up and conceal [his] illegal conduct from, among others, this Court, the Israeli authorities and courts and Orly."*
>
> **Truth**: As Defendants know, Dellaportas committed no illegal conduct, and did not "cover up" anything. The investigative report about Orly was promptly turned over to her, which she then misused to threaten the investigator.
>
> ***Libelous Allegation #4****: "Dellaportas fabricat[ed] a falsehood that her husband and her lawyers had threatened the investigator."*
>
> **Truth**: The threats are on tape and transcribed.
>
> ***Libelous Allegations #5****: "In 2018, [Defendants] stole Orly's travel records."*
>
> **Truth**: Dellaportas did no such thing.

43. The foregoing are just a sampling of the malicious, libelous and false allegations against Dellaportas. Further down, Defendants also falsely accuse him of "perjury," a felony, without pointing to any statement he has ever made under oath, true or false. That is the sort of abject disregard for truth they exhibit throughout the Sham Claims.

44. As with Orly (who, as outlined above, has a long history of being called out by courts for lying under oath), for Bowen as well, this means of practicing law appears to be his standard practice. As reported in *Law360*, Bowen is a defendant with others in a malicious prosecution case pending in Florida, in which the court has denied Bowen's motion to dismiss. The complaint in that action has eerie parallels to this one:

> **"Despite knowing (or at the very least having should known) that the DNA test results were obtained through illegal means, coerced, and false, … Bowen … disseminated [them] to others, including members of the media, law enforcement, and the Court… ..**

> **Perhaps even more egregiously, … Bowen attempted to seek criminal prosecution of Mrs. Perlmutter [his litigation adversary]** based on DNA results that [he] knew to be illegally collected and purposefully manipulated…. **Upon information and belief, [Bowen *et al*.] undertook these actions in an attempt to strengthen the civil case against Mrs. Perlmutter. …**
>
> On September 27, 2021, the claims against the Perlmutters were fully and finally dismissed, after years of malicious prosecution of the claims against them by … Bowen during which [he] knew that there was no direct evidence tying Mrs. Perlmutter to the hate mail campaign. Finally**, after years of frivolous litigation, Mrs. Perlmutter was fully vindicated with regard to the falsehoods set forth in the five complaints … signed by Bowen."**

45. These sorts of abuses will continue unless and until this Court steps in and sets things aright. Orly and her lawyers have spent the last twelve years litigating their meritless claims through unseemly, unethical, illegal, and extra-judicial conduct. The Sham Claims have caused, and until dismissed will continue to cause, Dellaportas significant economic harm. By these claims, Dellaportas seeks damages, and an end to the ugliness.

**COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

**<u>Count I: Attorney Deceit Under N.Y. Judiciary Law § 487</u>**
**<u>(Against Bowen and John Does)</u>**

46. Dellaportas realleges the foregoing paragraphs as if set forth fully herein.

47. As enumerated above, defendant Michael Bowen is guilty of deceit and collusion with intent to deceive the Court and other parties.

48. Upon information and belief, discovery will reveal that other, John Doe defendants who are also licensed attorneys aided, abetted, and conspired with Bowen in his multiple violations of N.Y. Judiciary Law § 487. Once the identities of such John Doe attorney defendants have been uncovered, Dellaportas intends to amend this pleading to name such attorneys as additional third-party defendants.

49. As a result of the foregoing, Dellaportas has suffered actual damages of no less

than $20 million.

50. The aforementioned acts are willful and malicious. Dellaportas is therefore also entitled to treble damages.

51. Accordingly, Dellaportas is entitled to, and hereby seeks, actual damages, treble damages, and attorney's fees (including quantum meruit for his own time), and costs for these violations of N.Y. Judiciary Law § 487.

**Count II: Libel / Defamation / Defamation *Per Se***
**(Against Orly, Bowen and John Does)**

52. Dellaportas realleges the foregoing paragraphs as if set forth fully herein.

53. As enumerated above, Defendants have made false allegations against Dellaportas, falsely accusing him of committing various crimes.

54. These statements are false and defamatory

55. Defendants know or should have known that their statements are false.

56. Defendants made such defamatory statements with actual malice, with knowledge of their falsity, and with a reckless disregard for their truth or falsity.

57. Their defamatory statements constitute defamation *per se* because they impugn Dellaportas' honesty, trustworthiness, dependability, and professional fitness.

58. No litigation privilege or immunity applies because: (a) the Sham Claims are alleged with malice so as to injure Dellaportas professionally; and (b) they are in fact a sham, in that Defendants filed them with no intent to pursue them, but rather to have them frozen on the docket in order to frustrate the legal representation of the TPR Client Parties.

59. Upon information and belief, discovery will reveal that other, John Doe defendants aided, abetted, and conspired with Defendants in their multiple libelous statements. Once the identities of such John Doe defendants have been uncovered, Dellaportas intends to

amend this pleading to name them as additional third-party defendants.

60. As a result of the foregoing, Dellaportas has suffered actual damages of no less than $20 million.

61. The aforementioned acts are willful and malicious. Dellaportas is therefore also entitled to punitive damages.

62. Accordingly, Dellaportas is entitled to, and hereby seeks actual damages, punitive damages, and attorney's fees (including quantum meruit for his own time), and costs.

**Count III: Tortious Interference With Business Relations**
**(Against Orly, Bowen and John Does)**

63. Dellaportas realleges the foregoing paragraphs as if set forth fully herein.

64. As enumerated above, Dellaportas has a twelve-year, highly successful business (attorney-client) relationship with the TPR Client Parties. Given the manner in which Orly, her Husband-Lawyer, her father, and his creditors litigate without regard to cost or merit, it is reasonable to expect that relationship to continue years into the future.

65. The Sham Claims, along with the frivolous claims filed against the TPR Client Parties in the same adversary proceeding, are intended to, and do, interfere with that relationship by manufacturing an artificial conflict of interest, and by detracting Dellaportas from his efforts to represent the TPR Client Parties as he has done for the last twelve years.

66. Defendants filed the Sham Claim, together with the frivolous claims against the TPR Client Parties, for such illicit purposes, and for no valid purpose.

67. Defendants are motivated by ill-will, malice, and a desire to injure Dellaportas.

68. Upon information and belief, discovery will reveal that other, John Doe defendants aided, abetted, and conspired with Defendants in the foregoing tortious interference. Once the identities of such John Doe defendants have been uncovered, Dellaportas intends to

amend this pleading to name them as additional third-party defendants.

69. As a result of the foregoing, Dellaportas has suffered actual damages of no less than $20 million.

70. The aforementioned acts are willful and malicious. Dellaportas is therefore also entitled to punitive damages.

71. Accordingly, Dellaportas is entitled to, and hereby seeks actual damages, punitive damages, and attorney's fees (including quantum meruit for his own time), and costs.

**REQUEST FOR RELIEF**

WHEREFORE, Dellaportas request that this Court enter judgment as follows:

1. For each of Counts I, II and III, awarding Dellaportas a judgment against defendant Michael Paul Bowen, and against each of the John Doe defendants who are lawyers, in the amount of no less than $20 million, to reimburse him for his damages sustained by virtue of such defendants' wrongful acts, plus punitive and/or treble damages, pre-judgment interest, attorney's fees (including quantum meruit for his own time), and costs;

2. For each of Counts II and III, awarding Dellaportas a judgment against each of defendant Michael Paul Bowen and Orly Genger, and against each of the John Doe defendants, in the amount of no less than $20 million, to reimburse him for his damages sustained by virtue of such defendants' wrongful acts, plus punitive damages, pre-judgment interest, attorney's fees (including quantum meruit for his own time), and costs;

3. awarding Dellaportas all other and further relief that is just and proper.

Respectfully submitted:

John Dellaportas, *Pro Se*
c/o Emmet, Marvin & Martin, LLP
120 Broadway
New York, NY 10280
(212) 238-3092
jdellaportas@emmetmarvin.com